## GARROZI *v.* DASTAS.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF PORTO RICO.

No. 72.  Argued October 31, November 1, 1906.—Decided January 7, 1907.

*Royal Insurance Co.* v. *Martin,* 192 U. S. 194, followed as to the jurisdiction of this court over appeals from the District Court of the United States for the District of Porto Rico.

The party causing the removal from the local court of Porto Rico to the United States courts of a case, over which the latter would have had original jurisdiction as to all parties impleaded had it been brought there originally, cannot, after judgment against him, assert lack of jurisdiction of the United States court solely on the ground that the removal was erroneous.

Under the law of community property in Porto Rico, the wife does not, as a consequence of a judgment of divorce against her, forfeit her interest in the community.

In liquidating the community the husband is not chargeable with an obligation to return to the community sums spent by him on the ground that the expenditures were unreasonable or extravagant.

If there is any amount due a wife, against whom a judgment of divorce has been rendered, on account of her interest in the community, she is

entitled to provoke a liquidation, and to a decree against the husband for the amount so due and for alimony and expenses actually awarded to her in the divorce suit, but not for additional sums for services of counsel in the suit for liquidation.

THE facts are stated in the opinion.

*Mr. Charles M. Barman* and *Mr. Fritz von Briesen,* for appellants:

This court has jurisdiction of this case on appeal. Rev. Stat. § 702; Act of March 3, 1885; chap. 355; *Royal Ins. Co.* v. *Martin,* 192 U. S. 150.

The United States District Court for Porto Rico had no jurisdiction to hear, try or determine this case and its decree must be annulled for want of jurisdiction. *C. & L. M. Ry. Co.* v. *Swan,* 111 U. S. 379; *Capron* .v. *Van Noorden,* 2 Cr. 126; *Brown* v. *Keene,* 8 Pet. 112; *Jackson* v. *Ashton,* 8 Pet. 148; *Bors* v. *Preston,* 111 U. S. 252; *Dred Scott case,* 19 How. 393, 400; *Pequingnot* v. *Pennsylvania R. Co.,* 16 How. 104; *Cutler* v. *Rae,* 7 How. 729; *Continental Ins. Co.* v. *Roades,* 119 U. S. 237; *Torrence* v. *Shedd,* 144 U. S. 533; *Hanrick* v. *Hanrick,* 153 U. S. 192–198; *Neal* v. *Pennsylvania Co.,* 157 U. S. 153.

Under the Civil law a woman divorced for her adultery has no right of action for any share in the marriage community assets. Art. 73 of Civil Code in force in Cuba, Porto Rico and Philippines; Spanish Civil Code Art. 1434; French Civil Code, Art. 299; Ballinger on Community Property, § 5, p. 6.

In the liquidation of the marriage copartnership assets the legitimate expenses made by the husband during the duration of the marriage, no matter how large they were, cannot be charged against his share. Civil Code, Articles 1384, 1408, 1409, 1413, 1421.

Counsel fee and suit money cannot be given in a suit for liquidation of her share of property by a divorced wife after divorce; and in the courts of the United States counsel fee can never exceed the sum of twenty dollars. Ballinger on Community Property, § 119, note; Rev. Stat. § 823; *Drais* v. *Hogan,*

50 California, 121; *Celluloid Mfg. Co.* v. *Chandler*, 25 Fed. Rep. 9; *Troy Iron Factory* v. *Corning*, 7 Blatch. 16; *Goodyear* v. *Sawyer*, 17 Fed. Rep. 13; *Williams* v. *Morrison*, 32 Fed. Rep. 683; *Cleaver* v. *Traders' Ins. Co.*, 40 Fed. Rep. 864; *Parks* v. *Booth*, 102 U. S. 96.

*Mr. Frederic D. McKenney*, with whom *Mr. Francis H. Dexter* and *Mr. John Spaldinq Flannery* were on the brief, for appellee:

While under the law of Porto Rico a married woman, so long as the marriage relation continues and has not been terminated by divorce or death, has no right to demand the liquidation of the conjugal partnership, that principle has no application here. Although when this suit was instituted in the District Court of Ponce, and at the time of its removal into the United States District Court, the decree of divorce between complainant Dastas, and defendant Garrozi, had not been passed; nevertheless such decree had been passed and had become effective, and the marriage between the parties had been terminated thereby, long before the pleadings in this case had reached a final issue.

Under the laws in force in Porto Rico on June 9, 1902, the divorced wife was entitled to her proportionate share of the Bienes Gananciales notwithstanding the decree of divorce was founded upon her adultery. Civil Code of Porto Rico, Articles 1315, 1392, 1393, 1394, 1401, 1407, and others.

It is conceded that under the letter of the Civil Code of 1889 and of 1902 the husband is the administrator of the conjugal partnership, and that dispositions of the assets of the partnership made by him in good faith cannot be questioned by the wife, but it is expressly provided by the Code of 1889 (§ 1413) that:

"Every alienation or agreement which the husband may make with regard to said property in contravention of this Code or in fraud of the wife shall not prejudice her nor her heirs."

The court below properly held that the ascertained extravagances of Garrozi in connection with his European excursions

amounted to a fraudulent diminution of the ganancias, an alienation fraudulently against the interest of the wife, at least to the extent of $22,000 and properly charged this against his separate estate.

The allowance of counsel fees in the present case had no relation to legal services rendered in the divorce proceeding, but related solely to services rendered in the equity court in the wife's attempt to conserve the conjugal assets and to procure their liquidation pursuant to law. It was through her efforts and such services that the fraudulent transfers were set aside and the property taken into the possession of the court by the appointment of a receiver. *Trustees* v. *Greenough*, 105 U. S. 527; *Central R. R. Co.* v. *Pettus*, 113 U. S. 116.

MR. JUSTICE WHITE delivered the opinion of the court.

In the District Court of Ponce, in October, 1891, through a representative (next friend), Juana Dastas, alleged to be a resident of Porto Rico and a married woman, commenced this suit against her husband, Tomas Garrozi y Pietri, as also against Juana Maria Gonzalez and Domingo Piazzi y Pietri, all three of whom were alleged to be residents of Porto Rico. We shall hereafter speak of the plaintiff as the wife and the principal defendant Garrozi as the husband.

As far as essential to be considered, the facts alleged, the cause of action relied on and the proceedings had, up to the pleading by the defendants, are summarized as follows: The marriage took place in May, 1886, and, as no antenuptial contract was made, their property relations were governed by the community system under the Code of Porto Rico. They lived together until November, 1898, when they separated, and the wife, under the direction of the husband, resided in a house provided by him. There she lived until December, 1899, when, owing to the failure of the husband to support her, she removed to Ponce.

The husband in 1901 sued for a divorce on the ground of

the wife's adultery, and she, by a reconventional demand (cross bill), prayed for a divorce on the same ground, and because of cruel treatment. In this suit the court awarded the wife $75 a month alimony *pendente lite*. This not having been paid, the wife issued execution and realized from a sale of certain furniture one month's alimony. The remainder of the alimony up to the commencement of this suit, aggregaieng $225, and 598 pesos, Porto Rican currency, the amount of legal expenses incurred by the wife in defending the divorce suit and which had been allowed by the court, was yet unpaid. These amounts were uncollected because of the apparent insolvency of the husband. This insolvency was, however, only apparent, because there was a large amount of real and personal property belonging separately to the husband, or to the community, which the husband had, with the object of defrauding the wife, apparently disposed of by simulated transfers to the defendants Maria Gonzalez and Domingo Piazzi. The character and extent of this property were detailed as well as the various alleged simulated contracts, which it was averred had been made concerning the same. The prayer was that the contracts in question be set aside as mere fraudulent simulations, so as to enable the wife to exert her rights therein or thereagainst. The court admitted the petition to be filed and authorized the suit by the wife in the name of her representative or next friend. Before the day for pleading the husband, alleging himself to be a citizen and subject of France, and that by operation of law the wife was of the same nationality, obtained an order for removal to the court below. Subsequently the two other defendants also prayed and were allowed a removal. On the filing of the record a motion to remand was made based upon the fact that the husband's petition for removal contained no averment of residence. The court refused to remand and allowed an amendment alleging the residence of the husband to be in France.

Without attempting to state the many pleadings which

followed, the ultimate issues, and the action of the court may be thus summarized: The petition of the wife was amended and reformed, authority being given by the court for the prosecution of the suit on her behalf by her representative or next friend. The petition in its final form was less prolix, and the allegation was added that the divorce proceeding between the husband and wife, referred to in the original petition, had gone to the Supreme Court of Porto Rico, and had by that court been finally decided, decreeing a divorce in favor of the husband. The prayer for relief was amended to conform to this situation; that is, it was prayed not only that the simulated contracts be set aside, but, further, that the community be liquidated, and the wife be awarded her share. The defense, as finally made on the part of the husband, as well as the other defendants, was an averment of the good faith and reality of all the contracts alleged to have been simulated. Moreover, the husband denied that there was community property, because nothing had been acquired during marriage which fell into the community, and because all the property which he possessed, even assuming that the assailed contracts were simulated, was separate property, either owned at the date of the marriage or thereafter acquired as a reinvestment of separate funds. It was, moreover, specially alleged that, as the divorce had been decreed against the wife on account of her adultery, she had forfeited all her interest in the community, if any community property existed. Besides, the right of the wife to compel the liquidation of the community, even if she had not forfeited her right to a participation in the community assets, if any, was specially challenged.

The court appointed an examiner, who took and reported the testimony. Under a stipulation and order the cause was referred for report to a special master upon the facts and law. Before the master reported the wife prayed a receiver and an injunction, upon averments that the two defendants, to whom it was charged the property of the husband had been seem-

ingly transferred or encumbered by simulated contracts, were dealing with the same so as to dissipate the estate and frustrate the relief prayed. A receiver was appointed, and the defendants were enjoined as prayed. The report of the special master, as to both the facts and law, substantially sustained the claims of the wife. Exceptions taken to the report were overruled and the report was confirmed. The court below adopted the facts found by the master and reiterated them in the findings in the nature of a special verdict, made for the purposes of the present appeal. By those findings all the charges of fraudulent simulation relied upon by the wife were found to be true, and, as a legal conclusion, all the property and assets to which the simulated contracts related were held to belong to the husband. Concerning the community and its liquidation, it was found, as a matter of fact, that the wife at the time of the marriage had no property, and subsequently acquired none, whilst the husband at the time of the marriage was the owner of various assets and described property, which was found to have been of the value, at the time of the marriage, of $71,500. The net property of the husband at the date of the dissolution of the marriage, including all reinvestments or avails of his separate property existing at the time of the marriage, and, allowing for community debts, was found by the court to be $77,000, thus leaving $5,500 as the acquet or gain of the community, which was subject to be divided equally between the husband and wife. In addition, the court found that during the marriage the husband had spent, out of the revenues of his property, which revenues fell into the community, the sum of $47,000, during various trips made by him to Europe, and that these expenditures by the husband, from revenue which belonged to the community, were unreasonable to the extent of $22,000. From the facts thus found, as a matter of law, it was concluded that the $22,000 should be treated as an existing acquet of the community, subject to be equally divided between the parties. The sum, therefore, of the community property for distribution was

fixed at $27,500, the wife's share, therefore, being $13,750. The court in its final decree annulled the simulated contracts, and decreed the property to which such contracts related to belong to the husband, and, fixing the sum of the community as above stated, a money decree was entered in favor of the wife for her share thereof, $13,750. The decree reserved the right of the court to make such further orders as might be necessary, the receiver was directed to make full report, and a special master was appointed with power to sell the property in the custody of the receiver, if necessary, to pay the decree in favor of the wife. On the day after the entry of the final decree, on motion of the wife, the court passed a further decree in her favor, directing the payment to her, first, of the sum of $598, awarded to her by the District Court of Ponce as her expenses in the divorce litigation, and the sum of $133.50, interest thereon to the date of the decree; second, the sum of $885, due for alimony awarded by the District Court of Ponce to the date of the decree of divorce; and, third, the sum of $1,500, on account of solicitors' fees in the pending litigation—a total of $3,116.50. The receiver was directed to pay these several sums out of any money in his hands, and in default of sufficient funds execution to enforce against the husband was authorized.

The court, in its findings, has stated the rulings which were excepted to with respect to the admission or rejection of evidence, accompanied with such portions of the evidence as it deemed adequate to enable a review of such rulings.

Before coming to the merits we must dispose of three preliminary questions. First. The suggestion of a want of jurisdiction in this court is without merit. *Royal Insurance Company* v. *Martin*, 192 U. S. 149. Second. The contention that the court below was without jurisdiction, and that the cause, therefore, should not be passed upon on the merits, but should be remanded to the court below, with directions to remand to the local court from which it was removed, is also without merit. That the case was within the original jurisdiction of

the United States District Court of Porto Rico clearly results from the broad grant of jurisdiction conferred by the third section of the act of March 2, 1901, 31 Stat. 953, c. 812, reading as follows:

"That the jurisdiction of the District Court of the United States for Porto Rico in civil cases shall, in addition to that conferred by the act of April twelfth, nineteen hundred, extend to and embrace controversies where the parties, or either of them, are citizens of the United States, or citizens or subjects of a foreign State or States, wherein the matter in dispute exceeds, exclusive of interest or costs, the sum or value of one thousand dollars."

The assertion of the want of jurisdiction in the court below rests, however, not upon a denial of power in that court to have entertained the controversy if the suit had been originally brought there, but upon the contention that as a defendant other than the husband was a resident and citizen of Porto Rico, the cause was improperly removed from the local court. And the proposition goes to the extent of insisting that such want of jurisdiction may be asserted by the person who procured the removal, who resisted the effort to remand, and when the want of jurisdiction is only suggested after trial and final decree. The premise upon which these contentions are based is a portion of the text of the thirty-fourth section of what is known as the Foraker Act, act of April 12, 1900, 31 Stat. L. 84; c. 191, which provides that—

"The laws of the United States relating to appeals, writs of error and certiorari, removal of causes, and other matters and proceedings as between the courts of the United States and the courts of the several States shall govern in such matters and proceedings as between the District Court of the United States [for Porto Rico] and the courts of Porto Rico."

Without so deciding, we concede, for the sake of the argument, that where the power to remove from a state court to a court of the United States is restricted by statute to a certain class of cases, a removal operated contrary to the statute

does not divest the state court of jurisdiction, and, therefore, does not confer jurisdiction on the court to which the cause has been wrongfully removed, even although the cause may have been one of which such court might have taken jurisdiction originally. So, also, we concede for argument sake that in such a case the party wrongfully procuring the removal may escape the effect of a judgment rendered against him in the forum to which he voluntarily resorted, by suggesting after judgment the want of power to remove. But these concessions are not decisive of the case at bar, because of the extent of the jurisdiction conferred upon the United States Court in Porto Rico by the act of 1901; that is to say, in consequence of the enlarged character of the jurisdiction conferred by that act, and the obvious departure which it manifests from the principles controlling the jurisdiction of a United States court as contradistinguished from a state court, we do not think the rule which demarks the line between the courts of the United States and state courts within the removal act should be held applicable to Porto Rico to the extent which might have obtained had the act of 1901 not been enacted. We conclude, therefore, that where a case is removed from the local Porto Rican court to the United States court, over which case the latter court would have had jurisdiction as to all the parties impleaded if the case had been there originally brought, even though the removal was irregular, the party who caused the removal cannot be heard after judgment against him to assert that the United States court was wanting in jurisdiction solely on the ground that the case was erroneously removed.

3. The objections to rulings made by the court in admitting and rejecting evidence are numerous. We shall not undertake to review them in detail or state at length our conclusions concerning them; contenting ourselves with saying that after examining them all we think they are without foundation, either because fundamentally unsound or because the objections concerned not the admissibility but the mere weight of

the evidence offered or rejected, or because the record is not in such a condition as to enable us to overcome the strong impression we form that no prejudicial error resulted from the rulings complained of.

The conclusive effect of the facts found below narrows the issues. Thus the finding that the contracts were fraudulent simulations sustains, the legal conclusion that the property to which the contracts related belonged to the husband, and therefore that subject is put out of view. Again, as the facts found concerning the sum of the property owned by the husband at the date of the marriage and the amount owned by him at the date of the dissolution of the community by the divorce, sustain the conclusion that the difference between the two was an acquet or gain of the community to be divided equally, that question need not be further considered. In order, therefore, to dispose of the entire controversy it will be necessary to decide only four questions: First, whether the wife, as a consequence of the judgment of divorce rendered against her had forfeited her interest in the community, if there was any such interest. Second, whether error of law was committed in crediting the community with $22,000, the amount expended by the husband for traveling and medical expenses during the years 1889 and 1890, and during the years 1895 to 1898, both inclusive, upon the ground that such expenditures were unreasonable and extravagant, and therefore created an obligation on his part to return the amount to the community as an acquet or gain thereof. Third, if there was due the wife any amount on account of her interest in the community, and such interest had not been forfeited, was she entitled as a divorced wife to provoke a liquidation of the community and to a decree in her favor for the amount, if any, of her interest in such community? Fourth, did the court below err as a matter of law, in addition to giving the wife a decree for her interest in the community, in allowing her the sum of the alimony *pendente lite* decreed in her favor by the local court up to the date of the divorce, the sum of her

expenses in the divorce suit which had been approved by the local court, and an additional sum of $1,500 for the services of the counsel of the wife in the cause.

1. It may be conceded that by the law of Spain, prior to the adoption of the Spanish Civil Code, the wife against whom a judgment of divorce for adultery was decreed forfeited all right to her share in the community existing between herself and husband. But that rigorous rule was not incorporated into the Spanish Civil Code, which was in force in the island of Porto Rico / when the territory was acquired. Spanish Code of 1889, War Department translation, Title 4, sec. 5, article 67 *et seq.* . Such forfeiture, moreover, did not obtain in the Porto Rican Civil Code, adopted after the acquisition of the island by the United States, and which was in force in that island when the decree of divorce, which was here involved, was rendered. Civil Code of Porto Rico for 1902, title 5, chap. 5, sections 173, 174. To the contrary, the Code of 1889 provided that, in case of a divorce for adultery, the guilty spouse should forfeit or lose, not his or her interest in the community, but "all that may have been given or promised him or her by the innocent one, or by any other person, in consideration for the latter." Code of 1889; article 73, paragraph 3. And a similar provision was incorporated in the Code of 1902, as follows:

"The party 'against whom the judgment is rendered (of divorce) shall forfeit to the party obtaining the divorce all gifts which the other party may have conferred upon such party during the marriage, or when the same was contracted, and the innocent party shall retain everything which has been acquired from the other." Sec. 174.

Both these provisions were plainly intended to depart from the rule of forfeiture prevailing in the more ancient Spanish law and to incorporate the rule of limited forfeiture, as existing in the Louisiana (article 156) and Napoleon (article 299) Codes, a similar provision to which has been enacted in the codes of some other countries; which have modelled their

codes on the Code Napoleon. De Saint-Joseph, concordance, vol. 1, pp. 24 *et seq.* This conclusion is reinforced by the consideration that, at the time of the adoption of the Spanish and Porto Rican Codes, the provision of the Napoleon Code on that subject had been conclusively determined not to operate a forfeiture of the community property. See authorities collected in note to article 299 in the Fuzier-Herman edition of the Code Napoleon, Paris, 1896.

The argument advanced in the brief of one of the counsel, that, despite the change in the code to which we have referred, the old rule of forfeiture should be held to obtain, because of the provision of article 1417 of the Code of 1889 and section 1330 of the Code of 1902, saying: "The spouse who by bad faith has been the cause of the nullity (of the marriage) shall not have a share in the common property," rests upon a mere misconception. The provision relied on in both the codes relates, not to the dissolution of a marriage by a decree of divorce or for any other cause, but to the recognition of the nullity of a seeming marriage for causes which have operated to prevent the marriage from having ever existed. In other words, the distinction between the article relied upon and the other articles to which we have previously referred is that which obtains between a decree of a court dissolving a marriage which has existed and a decree establishing that there never had been a marriage to dissolve. The pertinency of this distinction again becomes manifest when it is observed that a similar distinction and consequence exists in the Code Napoleon.

2. Owing to an apparent ambiguity in the finding of fact concerning the liability of the husband to the community for $22,000 it becomes necessary, before reviewing the legal conclusion of the court below on that subject, to fix the exact meaning of the facts found upon which that legal conclusion was based. As a preliminary to so doing we reproduce in the margin [1] the finding of fact on the subject, as well as the legal conclusion drawn by the court therefrom.

[1] That said defendant Garrozi made several trips to Europe during the

Whilst there are expressions in the finding referred to which, isolatedly considered, might lead to the inference that it was the intention of the court to find that the husband had not expended the money, but had concealed it or yet had it in his possession, we think the context of the finding and the result of the other findings establish that the court intended to and did find that the money was expended, and that the legal conclusion as to the liability of the husband to the community was arrived at because it was deemed that the expenditure of the money by the husband was unreasonable and extravagant. We say this results from the context, because, taking the whole finding, it seems to us clear that the purpose of the court was as stated. We say also it results from the other findings, because the facts found as to the sum of the property owned by the husband at the time of the marriage

---

continuance of his marital partnership, and spent large sums of money by reason thereof, which were, as near as can be determined from his testimony, the following amounts:

| | |
|---|---|
| In 1889 | $10,000 00 |
| In 1890 | 7,000 00 |
| In 1895 | 5,000 00 |
| In 1896–98 | 25,000 00 |
| | |
| Total | $47,000 00 |

Said defendant claims in his testimony that these trips to Europe and the expenditure of these large sums of money was rendered necessary by reason of his serious and continued illness. But said testimony is not substantiated by that of any other credible witness, while, if true, it could have been easily proven by the testimony of some of the physicians who attended him, and who must have had full knowledge of his condition during these times. But even granting that the journeys were necessary to defendant's health, the court is forced to the conclusion, either that said defendant has exaggerated the amounts expended or that such extravagant expenditures were not either necessary or reasonable, and hence not a proper charge against the property of the marital partnership.

It seems that twenty-five thousand dollars ($25,000.00) would have been a liberal expenditure under the circumstances for a man in defendant Garrozi's condition of life.

The court therefore concludes that twenty-two thousand dollars ($22,000.00) of the amount should be charged against the separate property of defendant Garrozi.

and the sum possessed by him at the time of the divorce exclude, by necessary implication, the possession by the husband of the $22,000.

It is provided in both the Code of 1889 (article 1412) and the Code of 1902 (sec. 1327) that the husband "is the administrator of the conjugal partnership." By the first of these codes (article 1413) this power of the husband was so complete as to endow him with authority to sell and encumber, not only all the movable, but also the immovable property of the community. In the second code, however (sec. 1328), the power of the husband to sell or encumber the immovable property is not given, except a contract to that effect is made with the consent of the wife. And by both codes all contracts of the husband in violation of definite provisions of the code or in fraud of the rights of the wife are made null and void against the wife or her heirs. Code of 1889, article 1413; Code of 1902, section 1328. The provisions in both codes making the husband the administrator of the community are here again like unto those obtaining in other countries where the community system prevails. Code Napoleon, article 1421; Louisiana Code, article 2404. The question, therefore, is this: Is the power of the husband, as the head and master and administrator of the community, in its nature so restricted that in the absence of express limitation he can, after the dissolution of the community, be called to account and compelled to return to the community money which he has actually expended during the existence of the community, because, in the judgment of a court, such expenses may be deemed to have been not suitable to his situation in life, extravagant, or even reckless? To answer this question in the affirmative would be to destroy the whole fabric of the community system as prevailing, not only under the Spanish and Porto Rican Codes, but as obtaining in those countries of the continent of Europe and here where that system prevails. We need not consider whether the community was derived from the Roman law, from an express provision of the early Saxon law, or from

the ancient customary law of the continent. For, however derived, the very foundation of the community and its efficacious existence depend on the power of the husband, during the marriage, over the community, and his right, in the absence of fraud or express legislative restriction, to deal with the community and its assets as the owner thereof. The purpose of the community, as expounded from the earliest times, whilst securing to the wife on the dissolution of the marriage an equal portion of the net results of the common industry, common economy and common sacrifice, was yet, as a matter of necessity, during the existence of the community, not to render the community inept and valueless to both parties by weakening the marital power of the husband as to his expenditures and contracts, so as to cause him to be a mere limited and consequently inefficient agent. See a very full citation of authority in Journal du Palais Repertoire, verbo, Communauté, 739, 741 *et seq.*

In determining the authority of the husband as to the common property two considerations are essential: The character of the right of the wife to the common property during the existence of the marriage and the scope of the power of the husband during the same period. In speaking on the nature of the right of the wife, Troplong says:

"The rights of the wife are dormant during the marriage, because the husband is charged to watch over and conduct the affairs of the conjugal society. But this right, which is inert, as long as the husband is at the head of the affairs of the community, becomes active when the marital authority ceases to exist. The wife is like a silent partner, whose rights arise and reveal themselves when the partnership ceases." Troplong, Contrat de Mariage, vol. 2, p. 136, No. 855.

Under the law of France prior to the Napoleon Code the extent of the power of the husband as to the community property was so great that it was considered in theory that the rights of the wife, in or to the community, were not merely dormant during the marriage, but had no existence whatever.

In other words, the doctrine was upheld that the wife during the existence of the community had but a mere hope or expectancy, and hence no interest whatever in the property or goods of the community until the community was dissolved. Dumoulin, Sur. l'art. 25, Cout. de Paris. And from this arose the expression that the community was a partnership which only commenced on its termination. As the result, however, of the right conferred upon the wife by some of the customs of France before the Code Napoleon, and also expressly given by that code (Code Napoleon, 1443 *et seq.*), to procure a decree dissolving the community when the affairs of the husband were in such disorder as to entail risk upon the wife it is the generally accepted doctrine under the Napoleon Code that the wife's interest in the community prior to the dissolution is subsisting, though dormant. But this implies no limit on the power of the husband whilst the community exists. In other words, although the right to a separation of property arises from the reckless conduct of the husband, thus affording a means of guarding against the consequences of such conduct in the future, the right to ask a separation does not give rise to the inference that the husband, after the dissolution of the community, may be held to account for money expended by him during the community because of reckless or extravagant conduct. Speaking on this subject, Rodiere and Pont (Traité du Contrat de Mariage) say (p. 596, No. 657):

"The husband can then sell [the immovable property of the community] by onerous title; he has in this respect an absolute power, and if, in disregard of the confidence which the law reposes in him, the husband, in disposing of the property, is impelled by the wish to indulge extravagant tastes or to provide for reckless dissipation, and not by the purpose of protecting the rights of the wife, the latter, even under these circumstances, has no recourse but to obtain a judicial termination of the community."

Referring to the power of the husband over the community, Troplong says:

"This power of the husband, which effaces the personality of the wife, and which is manifested by the name of lord and master of the community, given to the husband; this power, which seems like unto an absolute sovereignty, exists as well in the relations of the spouses between themselves as in their dealings between third parties. In effect, the husband can dissipate the goods of the community; he can lose, destroy, break and dilapidate. *Martius potest perdere, dissipare, abuti,* this is an elementary axiom of the Palace (of Justice). The wife has no right to call the husband to account, no damage to obtain for his acts. Hence it is true, indeed, that the husband is more than an administrator; he is an administrator *com libera.*" Ib., p. 138, No. 158.

See to the same effect the copious collection of authority found under article 1421 of the Code Napoleon, in the Fuzier-Herman edition of that code, *supra.*

That there is a substantial similarity between the law of the community under the Napoleon Code and the law on the same subject of Spain, prior to the Civil Code, and as now existing under that and the Code of Porto Rico, was conceded in the argument of the appellant. Indeed, that argument refers to and rests on some of the provisions of the Napoleon Code. Besides, when it is considered that the ancient Spanish law, and that law as formulated in the Code of 1889 or in the Porto Rican Code of 1902, confers no authority upon the wife to obtain a judicial dissolution of the community merely because of the disorder of the husband's affairs, it follows that the power of the husband under the Spanish system is in principle more extensive than it is under the Code Napoleon and the law of the countries which have followed that code. The practical identity of the husband's general authority, as head and master of the community, under the law of Louisiana, the Code Napoleon and the Spanish law was clearly expounded by the Supreme Court of Louisiana, in *Guice* v. *Lawrence,* 2 La. Ann. 226, as follows:

"The laws of Louisiana have never recognized a title in the

wife during marriage, to one-half of the acquets and gains. The rule of the Spanish law on that subject, is laid down by Febrero with his usual precision. The ownership of the wife, says that author, is revocable and fictitious during marriage. As long as the husband lives and the marriage is not dissolved, the wife must not say that she has *gananciales*, nor is she to prevent the husband from using them, under the pretext that the law gives her one-half. But, *soluto matrimonio*, she becomes irrevocably the owner of one undivided half, in the manner provided by law for ordinary joint ownership. The husband is, during marriage, *real y verdadero dueno de todos, y tiene en el efecto de su dominio irrevocable.* Febrero Adic. tomo 1 y 4, part 2d, bk. 1st, chap. 4, parag. 1, nos. 29 and 30; Pothier, Communauté, p. 35 and following; 12 Toullier, chap. 2, nos. 22 to 31; 14 Duranton, Droit, Franc., p. 281 and foll.; 10 Dalloz, Jurisp., p. 198 and fol.

"The provisions of our code on the same subject are the embodiment of those of the Spanish law, without any change. The husband is head and master of the community, and has power to alienate the immovables which compose it by an encumbered title, without the consent or permission of his wife. Civil Code, art. 2373."

True it is that in the Porto Rican Code of 1902 there was inserted a provision, previously commented on (section 1328), limiting the power of the husband to dispose of the immovable property of the community without the consent of the wife. But this express limitation as to one particular class of property, by inverse reasoning, is a reaffirmance of the power of the husband as head and master of the community in all other respects. The contention that because both by the Code of 1889 and of 1902 acts done by the husband as head and master of the community in fraud of the wife shall be void, therefore the expenses of the husband made during the community are subject to be reviewed on the dissolution of the community because of their unreasonable character is without merit. The fraud referred to of necessity relates to acts done by the

husband beyond his lawful authority, or which, if within his authority, have been done for the purpose of enriching himself or his separate estate or some third person, and which, therefore, whilst seemingly acts of community administration, are really not of that character.

3. The contention that the wife, even after the dissolution of the marriage, was without power to obtain the liquidation of the community and a payment to her of her share thereof, is based upon what is asserted to be the correct interpretation of articles 73, 1433, 1434 and 1435 of the Code of 1889. By these articles, it is insisted, where the dissolution of the marriage has been decreed because of the fault of one of the parties, the separation of property does not follow as a legal right in favor of the party for whose wrong conduct the divorce has been decreed, and may only be allowed by a court at the request or option of the one in whose favor the decree was rendered. And it is, moreover, insisted that if the divorce has been rendered in favor of a husband and against a wife for her fault, and a separation of property has been thereafter decreed at the instance of the husband, the power of the husband to administer the wife's share of the community remains whilst her interest in future acquets or gains disappears. But this reduces itself to the contention that in the case stated the community is dissolved yet continued. But whilst this reduction may point to the want of coherency in the proposition it is no reason why the code should not be enforced, if so it is plainly written. We do not stop to analyze the texts of the Code of 1889, relied on, for we think they are not controlling, even if they have the peculiar meaning contended for. We so conclude because of a change made by the Code of 1902. As we have already said, we are of the opinion that that code was in effect at the date of the rendering of the divorce decree. Now, that code not only eliminated the provisions of article 73 of the Code of 1889 relied on, but substituted a wholly different provision, directly repugnant to the contention we are considering. The provision referred to is section 173 of the Code

of 1902, saying, "A divorce carries with it a complete dissolution of all the matrimonial ties, and the division of all property and effects between the parties to the marriage." The argument made in the brief of one of the counsel that, even although the wife was entitled to a liquidation of the community and to a decree for her share the court below erred in giving a money judgment in her favor, because in any event it could only have lawfully awarded an aliquot share of the community property subject to be subsequently realized by a partition in kind or by licitation (sale) is unsound. As to the merit of the contention, if any, as a general proposition, we are not called upon in this case to express an opinion. We say this because, as a necessary result of the findings below, all the property either belonged to the husband at the date of the marriage or was afterwards acquired by him as a reinvestment of funds derived from such property owned by him at the marriage. It follows, therefore, that the rights of the wife arose simply either from an increased value of property or assets brought by the husband into marriage or as a result of the falling into the community of the revenues of the property of the husband. Under these circumstances we think the decree below was right.

4. The amount of the decree for alimony *pendente lite* and for expenses incurred by the wife in the divorce suit had been sanctioned by the local court and were binding upon the husband. We see no reason, therefore, why the court below should not have allowed those items. So far as the sum of $1,500 for counsel fees in the pending litigation which the court allowed as a charge against the husband, we have been referred to no authority sustaining the right to allow it and our own researches have enabled us to discover no sanction for such an award.

It follows that whilst the court below was right in allowing the wife the sum of $2,750 as her share of the acquets and gains of the community as established by the findings of fact, the court was wrong in allowing the $22,000, and the $1,500

attorney's fee.   The decree below must therefore be reversed and the cause be remanded with directions to enter a decree for the $2,750 and the alimony and expenses incurred in the divorce suit with the approval of the court as previously allowed, but rejecting the claim for $22,000 and $1,500, the costs of this court to be borne by the appellee and those of the court below by the appellant.

*Reversed and remanded.*