Ulpiano Casal Valdés, Plaintiff and Appellee, v. Rafael Sancho Bonet, Treasurer of Puerto Rico, Defendant and Appellant.

No. 7402.   Argued March 8, 1938.—Decided July 28, 1938.

*B. Fernández García, Attorney General, R. Cordovés Arana, First Assistant Attorney General, and M. Rodríguez Ramos, Deputy Attorney General,* for appellant.  *J. J. Ortiz Alibrán* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Four causes of action are alleged in the complaint in which the present action originated. In the first cause of action a claim is made for $201.27 paid under protest as income tax for 1918; in the second cause of action the claim is for $687.17, also paid under protest as income tax for 1920; and in the third cause of action the amount claimed is $140.90, likewise paid under protest as income tax for 1921.

The fourth cause of action will be considered by us after passing upon the question involved in connection with the first three, which question by reason of the answer filed and the statements of the plaintiff at the commencement of the trial has been reduced to the determination of whether or not the tax due had prescribed at the time the same was sought to be collected.

It has been proved that during the years 1918, 1920, and 1921 the plaintiff received income and failed to file returns with the Treasurer for the purpose of the assessment and

payment of the tax thereon as was his duty, and that for that reason and pursuant to the powers conferred on him by law, the Treasurer made the returns that the taxpayer should have made and assessed to him and collected from him the taxes sought to be recovered herein.

He acted in 1931. At that time Act No. 74 of 1925 (Session Laws, p. 400) was in force, sections 60 and 61 of which, in so far as now pertinent, read as follows:

"Section 60.—(a) Except as provided in section 61 and in subdivision (b) of section 57 and in subdivision (b) of section 62—

"(1) The amount of income and excess-profits and the amount of income taxes imposed by this Act or by Income Tax Act No. 59 of 1917, Income Tax Act No. 80 of 1919, Income Tax Act No. 43 of 1921, or by any of said Acts, as amended, shall be assessed within five years after the return was filed, and no proceeding in court for the collection of such taxes shall be begun after the expiration of such period. . . .

"Section 61.—(a) In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

"*          *          *          *          *          *          *

"(d) This section shall not (1) authorize the assessment of a tax or the collection thereof by distraint or by a proceeding in court if at the time of the enactment of this Act such assessment, distraint or proceeding was barred by the period of limitation then in existence, or (2) affect any assessment made, or distraint or proceeding in court begun, before the enactment of this Act."

Regarding the income tax for the years 1920 and 1921, it is quite clear that, as the taxpayer failed to file a tax return, and as the action for the collection thereof had not prescribed when the Act of 1925 took effect, such action had not prescribed either in 1931 when the Treasurer commenced proceedings. It was so decided by the trial court and the plaintiff did not appeal from that decision.

The court, however, thought that the action had prescribed as to the collection of the income tax for 1918, and as it so held and rendered judgment ordering its refund, the Treas-

urer took an appeal and assigned as a first error that holding of the court.

██ We think that the trial court was correct in so far as it decided that the mere fact of the failure to file a return was not sufficient for holding that the action had not prescribed but that it was necessary to allege and prove that such failure had for its object to evade the payment of the tax, since the applicable law was Act No. 80 of 1919, in connection with that of 1925, and not the latter statute exclusively. The contrary holding made in *Soto Gras* v. *Domenech*, 42 P.R.R. 506, must be overruled. We think, however, that it was error to hold that the Treasurer had failed to prove his case, as required by the Act of 1919.

We have already stated that it was proved that at the time of the action taken by the Treasurer in 1931 the taxpayer had not filed his income tax return for 1918. The Treasurer further alleged in his answer that he had omitted to do so in order to evade the payment of the tax, thus complying with the requirements of the aforesaid Act of 1919. Did he prove his allegation? Let us see what the district court said in this respect:

"Although it is alleged by the Treasurer that the omission to file the return had for its object to evade the payment of the tax, no evidence whatever tending to prove such allegation has been presented to us. Defendant's allegation is an imputation of fraud that should be proven, not by inferences or implications, but by facts and in such manner that no room is left for doubt. It is not sufficient to allege fraud. It is necessary to prove it and the proof must be robust, clear, and convincing."

It was the taxpayer's duty to file his return on his own initiative and without any urge from the Government, and we have already seen that in this particular case the Government alleged that the taxpayer had omitted to file his return in order to evade the payment of the tax. The case went to trial and, beyond the fact of the failure to file returns in that and in other fiscal years, the Government produced

no further evidence regarding the intention of the taxpayer. It relied on sections 101 and 102 of the Law of Evidence —sections 463 and 464 of the Code of Civil Procedure, 1933 ed.—the first of which provides that "a malicious and guilty intent from the deliberate commission of an unlawful act, for the purpose of injuring another, is presumed," and, the second, "that an unlawful act was done with an unlawful intent" and "that a person intends the ordinary consequence of his voluntary act."

In our judgment, in view of all the attendant circumstances, the presumption is sufficient. It would have been difficult for the government to procure direct documentary or parol evidence to establish a deliberate intent on the part of the taxpayer. The evidence introduced related to the latter's conduct, and such conduct speaks for itself. There was a legal duty to perform which he failed to perform, and he was charged not only with such failure but with the deliberate intent not to comply with his duty. The omission was necessarily prejudicial to the public treasury. His failure to act carried with it the nonpayment of the tax, which was the necessary consequence of an act done in violation of the law. If the taxpayer did not intend to evade the payment of the tax, it was incumbent upon him to show it, and this he attempted to do by testifying at the trial that the omission was due to the fact that he had relied on the filing of the returns by the business firm with which he was associated, as it was the custom of the bookkeeper to do so for the partners—an explanation which was not analyzed by the district court in its statement of the case and opinion, and which does not appear to us to be of sufficient weight to relieve him from responsibility.

The first error assigned is therefore nonexistent. Let us consider the second assignment which is formulated thus:

"The district court committed an error of law in holding that the income tax for 1920 should be assessed in equal shares on the plaintiff, Ulpiano Casal, and his wife."

In considering this assignment we must first refer to the fourth and last cause of action, in which the plaintiff alleged that in 1931 the Treasurer assessed against him the sum of $1,118.48 as income tax for 1929; that he appealed to the Board of Review, and that in accordance with the latter's decision the Treasurer imposed upon him a tax amounting to $1,189.46 which, together with $116.79 as surcharges, he paid under protest; that ever since 1926 he owned property jointly with Enrique Abarca and that, as the result of business transactions thereon, he received $17,291.65 in 1929, but that that amount did not represent income for that year exclusively but should be apportioned over the years 1926, 1927, 1928 and 1929; and that ever since 1927 he had been married to Santos Sellés and that notwithstanding this the Treasurer, upon making the return as of course *(de oficio)*, did so in the name of the plaintiff exclusively and included in a single return the total income that was not his exclusively but belonged in equal shares to himself and his wife as community property by reason of their marriage as provided by law.

In passing upon the questions raised, the district court stated that the evidence submitted was not sufficient to establish to what years the profits received in 1929 corresponded and applied the whole income to said year, just as the Treasurer had done; but it held that, as at that time Casal was married, the Treasurer lacked power to make a single return, and that such power belonged individually to the spouses. A judgment was rendered ordering a new assessment.

The applicable law is section 24 of Act No. 74 of 1925 which provides as follows:

"(a) The following individuals shall each make under oath a return stating specifically the items of his gross income and the deductions and credits allowed under this title—

"*       *       *       *       *       *       *

"(b) If a husband and wife living together have an aggregate net income for the taxable year of $2,500, or over, or an aggregate gross income for such year of $5,000 or over—

"(1) Each shall make such a return, or

"(2) The income of each shall be included in a single joint re-
turn, in which case the tax shall be computed on the aggregate
income."

So that according to the law, each spouse is a separate
taxpayer who is required to make a return, but that not-
withstanding this the income of each may be included in a
single joint return. Who is entitled to make such an elec-
tion? Casal claims that the right to elect belongs to the
spouses, since they are the best judges of what is best for
them. The Treasurer, on the contrary, maintains that where
the spouses fail to make an election within the statutory
period, it is his duty to make it himself. The trial court,
as we know, decided that Casal was right. After citing the
law, the trial court in its opinion said:

"The foregoing provisions make it incumbent upon the spouses
to file each a separate return; but under subdivision (2) the spouses
are allowed to file a single joint return if they consider it to their
advantage. This means that the law first considers the spouses as
two independent taxpayers but entitled to elect the filing of a single
joint return. We think that the defendant can not make such an
election. If this were so, that is, if the defendant had power to
convert the spouses into a single taxable entity, he would of course
elect that method in order to assess a higher tax, which would result
from the combined income of both spouses. Likewise subdivision
(c) of section 18 of the Act of 1925 provides that: 'If such husband
and wife make separate returns, the personal exemption may be taken
by either or divided between them.' So that the statute does not at
all confer on the Treasurer the power to make *motu proprio* joint
returns."

What happened was set forth in Casal's testimony at the
trial, thus:

Q. Were you a married person in 1929.—A. I was.—Q. And in
1928?—A. The same.—Q. Do you remember the date of your mar-
riage?—A. June 13, 1927. . . .—Q. What is your wife's name?—
Santos Sellés. . . .—Q. Could you tell the court whether you filed
any return for that year?—A. Yes, sir, I can say that I did not.—
Q. Did you not?—A. I did not.—Q. Was it then officially (*de oficio*)

made by the inspector?—A. It was. . . .—Q. Did your wife file any return?—A. If I remember correctly, after receiving the return made by the Treasurer there was filed an amended return in the name of my wife and another in my name.—Q. Were they accepted in the Treasury Department?—A. They were not.—Q. Were they rejected? —A. They were.—Q. Can you tell the court the date of the filing of such returns?—A. I can not.—Q. Was it long afterwards?—A. It was almost immediately upon receipt of the return officially made; I think it was within the following thirty days.''

There is no doubt that where the spouses comply with their legal duty and receive separate incomes, they are entitled to make the election. We think that the question arises not only where the spouses fail to make the election in time but also where community property is involved, even though the return be filed in time, because the splitting of the income every year involves in a way a liquidation of the community, which is not really liquidated until the conjugal partnership is finally dissolved.

As stated by the Supreme Court of the United States, speaking through the then Associate Justice White, in *Garrozi* v. *Dastas,* 204 U.S. 64, 79, 80:

'' 'The rights of the wife are dormant during the marriage, because the husband is charged to watch over and conduct the affairs of the conjugal society. But this right, which is inert, as long as the husband is at the head of the affairs of the community, becomes active when the marital authority ceases to exist. The wife is like a silent partner, whose rights arise and reveal themselves when the partnership ceases.' Troplong, Contract de Mariage, vol. 2, p. 136, No. 855.

''Under the law of France prior to the Napoleon Code the extent of the power of the husband as to the community property was so great that it was considered in theory that the rights of the wife, in or to the community, were not merely dormant during the marriage, but had no existence whatever. In other words, the doctrine was upheld that the wife during the existence of the community had but a mere hope or expectancy, and hence no interest whatever in the property or goods of the community until the community was dissolved. Dumoulin, Sur. l'art. 25, Cout. de Paris. And from this arose the expression that the community was a partnership which only

commenced on its termination. As the result, however, of the right conferred upon the wife by some of the customs of France before the Code of Napoleon, and also expressly given by that code (Code Napoleon, 1443 *et seq.*), to procure a decree dissolving the community when the affairs of the husband were in such disorder as to entail risk upon the wife it is the generally accepted doctrine under the Napoleon Code that the wife's interest in the community prior to the dissolution is subsisting, though dormant.''

And as stated by this Supreme Court, speaking through Associate Justice Texidor, in *Ramos González & Co.* v. *Registrar,* 41 P.R.R. 58, 61:

''The Civil Code of Puerto Rico has prescribed that the conjugal partnership shall begin on the same day that the marriage is celebrated and shall cease upon the dissolution thereof. Rights are acquired and responsibilities created under such partnership, and although the latter are susceptible of a final and mathematical determination, both during the existence and after the dissolution of the marital relation, the former are incapable, while the marriage lasts, of a practical fulfillment, such as that each spouse should enjoy a fixed and determined portion during the existence of the partnership. It thus appears from the Code, that whereas in sections 1323 and 1326 inclusive liabilities are recognized which may be the subject of prompt enforcement, such as debts and obligations contracted during the marriage, arrears or interest, minor repairs, support and education of the children, and others, section 1310, which is of the utmost importance as regards the character of the partnership, contains the expression 'shall belong' and the condition 'upon the dissolution of the marriage.' This section reads as follows:

." ' 'Sec. 1310. By virtue of the conjugal partnership the earnings or profits indiscriminately obtained by either of the spouses during the marriage shall belong to the husband and the wife, share and share alike, upon the dissolution of the marriage.'

''The conjugal property belongs to the marital community as long as the marriage continues. It is only upon the dissolution of the latter, and not before, that the moieties mentioned in the law may be determined. The will of the spouses can not invalidate the mandate and creation of the law. The first thing that the spouses do by this deed is to anticipate a future situation which is not yet available to them, and to consider as a fact that which is only a right *in potentia.* Thus they attempted to adjudicate to each other the

ownership of a moiety of the said property, and to base thereon their individual contributions.''

However, as the law involved is a tax statute which must be construed in the sense most favorable to the taxpayer, we are inclined to hold that the rule adopted in the States of the Union where the conjugal partnership also exists in an identical or similar form to that recognized in this jurisdiction is applicable in Puerto Rico, said rule being stated in ''Law of Federal Income Taxation,'' by Paul and Mertens, as follows:

''Notwithstanding the option accorded by the statute to husband and wife enabling them to elect to file a joint return, husband and wife are, in the absence of a choice by them, separate taxpayers. . .'' (Vol. 4, p. 540, sec. 3909.)

''The United States Supreme Court has ruled that each spouse in Arizona, Louisiana, Texas, and Washington may file separate returns and report one-half of the community income. It was pointed out that under those state laws the wife had a *present vested* right in the community property equal to the husband, and that one-half of the community income was, therefore, income of the wife and taxable to her. The Treasury Department has promulgated the same rule for Idaho, Nevada, and New Mexico on the basis of the Supreme Court decisions. . . . The Supreme Court has brought the California rule in accord with the general rule as to other states so that each spouse residing in California may report one-half of the community income after July 29, 1927. . . .'' (Vol. 2, p. 57, sec. 16.03.)

And if this rule is followed where the return is filed in time, we think that it logically should be applied when such filing is made after the expiration of the term, if the interested party insists thereon, as happened in the present case. A delay carries with it the surcharges and penalties which the legislature deemed proper and expressly provided in the law and those entailed by a joint return are not included among them.

The second assignment is without merit. The third and last assignment is stated but not argued in the brief. It

refers to the judgment and is covered by the two preceding assignments.

The judgment must be reversed in so far as it decreed the refund of $201.27 collected as income tax for the year 1918 and as modified, the judgment is affirmed.

Mr. Justice Wolf concurs, except as regards the reversal of the judgment decreeing the refund of $201.27 collected as income tax for the year 1918, since he considers that that pronouncement should also be affirmed.

Mr. Justice De Jesús took no part in the decision of this case.