## GLENN, Tutor *v.* ELAM, Tutrix.

A tutor who employs, for his own advantage, slaves belonging to his pupil, or occupies land belonging to him, will be bound to the latter for any profits which might have been derived from hiring the slaves, or letting the lands, to a third person. C. C. 327, 328.

Where a tutor, without authority, compromises the interest of his pupil in a promissory note, he will not be liable for the nominal amount of the portion of the note due to his pupil, but for its fair value at the date of its illegal alienation by him. C. C. 333.

Where a tutor involves the estate of his pupil in a litigation which is judicially pronounced to have been vexatious, and for which the estate is compelled to pay damages, he must be charged with the amount of the damages.

The husband, as head and master of the matrimonial community, may dispose of its moveables even by a gratuitous title, for the benefit of any person.

The revenues of the separate estate of the husband form a part of the community; and where debts due by the husband before marriage, have been paid by him during the community out of the revenues arising from his separate estate, as he had a right to do, his separate estate will be responsible to the community, after its dissolution, for the amount of the debts so paid. C. C. 2372, 2377.

Where the amount due from a tutor has been ascertained by a judgment, interest is due on the amount from the date of the judgment.

A tutor who has neglected to invest, in the name of the minor, the excess of the revenues of the latter over his expenses whenever such excess amounts to $500, is liable for legal interest on such excess. C. C. 341. Stat 19 February, 1825. In adjusting the accounts of the tutor the entire revenues of the pupil, including any interest which the tutor may have become liable to pay under art. 341 and the stat. of 1825, are to be computed annually ; and the excess of the revenues of the minor over his expenses, is to be considered as forming from that date, a part of his capital in the hands of the tutor, and, upon that excess, when it amounts to $500, the tutor owes legal interest, if he fail to invest it as required by law.

APPEAL by plaintiff from a judgment of the District Court of Catahoula, Barry, J. O. N. Ogden, for the appellant. Mayo, for the defendant. McGuire and Ray, for the minors, Gillespie. The judgment of the court in this case was pronounced by the Chief Justice, and Justices King and Slidell.

SLIDELL, J. The present controversy arises from proceedings instituted for a partition of the estate of *Lucius W. Elam.* The parties are, *Glenn*, tutor of the five children, issue of the marriage of *L. W. Elam* and *Elizabeth H. Bray ; Mrs. Ann B. Gillespie*, in her own right, and as tutrix of the two minor children, issue of her marriage with *L. W. Elam ;* and *S. P. V. Gillespie*, under-tutor of the last named minors.

GLENN.
*v.*
ELAM.

L. W. Elam was twice married. On the 14th. June, 1832, he married Elizabeth H. Bray, who died on the 14th January, 1843, leaving, as her sole heirs, the five children above named. He contracted a second marriage, with Mary Ann B. Gillespie, on the 22d February, 1844, and died on the 12th October, 1847. The first wife left a separate estate. There was also, at her death, a considerable property, belonging to the community of acquests and gains, which had existed between her and her husband. He was confirmed as natural tutor of his five minor children, and retained possession of the separate property of his wife, as well as of that belonging to the community; continuing to possess and use the whole as though he were owner. He took no steps to liquidate the community, nor effect a partition of it between himself and his children.

On the 18th April, 1843, at the suit of J. W. Stone, the under-tutor of the five minor children, a judgment was rendered by the Probate Court of Catahoula, against Elam, in their favor, for $11,807 50, being the amount due to them by him for paraphernal property of their mother, which he had received and converted to his own use. This judgment also declares these minors to be the owners, by inheritance from their mother, of two slaves in the possession of the defendant, and to be entitled, in the same right, to an undivided half of fifteen other slaves, also in his possession. He executed, in April, 1844, a special mortgage in favor of his children for the amount of the judgment against him.

Elam was himself the separate owner of certain property. After his second marriage he acquired other property. He contracted debts during his first marriage which were paid during the second. Mrs. S. P. V. Gillespie. appears to have had no separate property. She was in community with her husband.

In the consideration of this case we will ascertain the ownership of the several items of real and personal estate and slaves involved in this controversy, and then examine a variety of questions of law and fact material to its decision.

I. *The separate property of Elizabeth H. Bray,* consisted of certain slaves and personal effects, of which she was the sole owner, and certain other slaves of which she owned an undivided half. This separate property is detailed in the schedule marked A, * annexed as part of the decree in this cause. The extent of her undivided interest has been questioned by the widow and children of the second marriage ; but we consider the judgment of the Court of Probates, rendered before the second marriage was contracted, and other evidence in this cause, as closing and satisfactorily establishing the extent of her interest.

II. *The separate property of Lucius W. Elam.* This is exhibited in schedule B, annexed as part of the decree in this cause.

III. The property of the community of acquets and gains, which existed between Lucius W. Elam and Elizabeth H. Bray. This is exhibited in schedule C, annexed as part of the decree in this cause.

IV. The property of the community of acquets and gains which existed between Lucius W. Elam and Mary Ann B. Gillespie. This is exhibited in schedule D, annexed as part of the decree in this cause. In these schedules are not included certain claims belonging to or due by these estates, which will be specially noticed hereafter.

V. Various claims are set up by the minors of the first marriage, against their father, their tutor, and the surviving partner of the community which existed between him and their mother.

---

* The schedules referred to in this opinion, are not published.                          R.

1st. They claim interest, at the legal rate, on the sum of $11,807 50, an amount of money ascertained in their favor, as regards the separate estate of their mother, by the judgment of 18th April, 1843. The grounds of the allowance of this claim are stated in the opinion of the Chief Justice, *infrâ*, to which we refer.

2d. They claim reasonable hire in compensation of the services of the slaves, which, some in whole and some in part, belonged to the separate estate of their mother. To this they are clearly entitled. The tutor is bound to manage the estate of the minor as "a prudent administrator", for the benefit of the minor ; and cannot enrich himself at the expense of his ward. Having employed the slaves for his own advantage, he must make retribution, to the extent of the advantage he could have procured for them, if he had hired the slaves to a third person. C. C. 327, 328, etc. This is a contest as to the amount which should be allowed. Under the evidence we must estimate it at $110 per annum, the expenses of food, clothing, and taxes, etc., being considered at the charge of the employer. The items of this claim are stated in schedule E, annexed as part of this decree. The same remarks apply to their interest in the slaves of the community.

3d. They claim reasonable compensation, in lieu of rent of the lands belonging to the estate of their mother as partner in community. This claim stands on the same footing as the preceeding item, and must be allowed. The items of this claim are stated in schedule F, annexed as part of this decree.

4th. They claim interest on the revenues which would have been derived from the hire of the slaves, the rent of the lands, and the interest on the money due to them under the judgment, if these revenues had been invested for their benefit. The reasons for allowing this claim, are stated in the opinion of another member of this court, to which we refer. [See opinion pronounced by *King*, J. *infrâ*.]

5th. They claim to hold their former tutor liable for a large sum, under the following circumstances. *Elam*, during his first marriage, sold certain lands and slaves, in a portion of which *Mrs. Elam* had a separate interest, to *J. A. Bynum*, for which he received three notes of $8333 33, bearing ten per cent. interest from January 1, 1839, and payable respectively in 1840, 1841, and 1842. For the portion of the price which her separate property brought in this sale, these minors had judgment in April, 1843. The item forms part of the judgment of $11,807 50, already mentioned.

It is conceded by counsel, that the notes formed part of the community of the first marriage, which we will hereafter designate as the *Bray* community, The first of these notes was negotiated by *Elam* during the first marriage, and requires no attention. The second note was transferred by *Elam*, in 1840, to *Duncan*, as collateral security for a debt of $9000 and interest, due by *Elam* to *Duncan*. The circumstances of this transfer are stated in the case of *Duncan* v. *Elam*, 1 Rob. 135. *Duncan* subsequently returned this note to *Elam*, who transferred it, with the third note, to *Isaac Thomas*, in 1841. Subsequently *Thomas* re-transferred these notes to *Elam*, who, in June, 1843, transferred them again to *Duncan* in part payment of the debt due to him, at the rate of $6000, and received credit for that amount, *Duncan* giving him time for the residue of the debt. The transfer of the notes to *Duncan* was absolute ; but it was at the same time declared in the deed of transfer that, the $6000 was the sum liquidated, upon settlement between *Bynum* and *Elam*, as being due by the former to the latter.

GLENN
v.
ELAM.

The counsel of the minors has properly said that, the tutor had not the right thus to compromise with *Bynum*, and alienate the property of the community without a judicial authorization; but having done so, his accountability, under the evidence, is not for the face of the notes, but for their fair value at the date of the illegal withdrawal of this asset from the community. The measure of damages is established by law :—" The tutor shall return to·the minor the estimated value of those moveables which he cannot restore in kind, or which he has suffered to deteriorate through want of care." C. C. 333. See also *Merceir* v. *Canonge*, 12 Rob. 392. Under the evidence, our minds are left in doubt upon the question, whether the act of the tutor was beneficial or not to the community. If the real value of the debt was not more than $6000, then the community was not injured; a debt of the community has been extinguished by giving in payment an asset of equal value, and the minors have no cause of complaint. If, on the other hand, it was worth more, or if an injurious compromise was made with *Bynum* after the death of *Mrs. Elam*, the tutor became responsible to the minors for all the injury which has been incurred. We have considered it our duty, in this state of uncertainty, to remand the cause. It will be easy, by taking the testimony of *Duncan, Bynum, Thomas*, etc., to reduce to a certainty what is now doubtful.

6th. In connection with this subject there is a right on the part of the minors, which commends itself to our consideration. The tutor was bound to a faithful and prudent gestion of the affairs of his ward. While he neglected to obtain a judicial settlement of the community in which these heirs were interested, he also involved the estate in a litigation which was judicially pronounced vexatious, and was closed by the infliction of a penalty of $2500, damages. The community was thus mulcted in a heavy sum after the death of *Mrs. Elam*. Although the litigation began some months before her death this penalty might have been avoided by abandoning the injunction, and dealing conscientiously with the creditors, instead of forcing them to wait for a trial and judgment. The circumstances of the litigation were inconsistent with his official duty; and, we think, the minors should be relieved, by making *Elam's* share in the *Bray* community bear the whole burden of the damages thus imposed.

7th. The minors are entitled to receive from their tutor the sum of $1200, being one-half the value of certain improvements on public land, made during the first marriage; which lands *Elam*, after the death of his wife, entered in his own name, and which have been treated as his separate estate.

8th. The tutor is entitled to a credit at the rate of $96 a year, for the board lodging, clothing, and maintenance of each of the minors.

VI. The *Bray* community must reimburse to the *Gillespie* community the sums paid by the latter, out of crops produced during the second marriage, to creditors of the *Bray* community, as shown in schedule H, annexed as part of the decree in this cause. The *Bray* community must also reimburse to the *Gillespie* community the sum of $1137 50, being the value of seven cabins, erected at the expense of the latter on the lands belonging to the former. See schedule H.

VII. The *Gillespie* community is answerable to the minors for their share of the hire of the slaves and rent of lands, at the rates above stated, from the date of the second marriage, to the death of *Elam*. The minors are accountable to the *Gillespie* community for their board, maintenance, etc., at the rate of $96 each per annum, to the death of *Elam*. See schedules E, F, and G, etc.

VIII. After due settlement of the *Bray* and *Gillespie* communities, and of

the separate estate of *L. W. Elam*, the several estates in controversy are to be held and divided as follows :

The five minor children of the first marriage are the sole heirs of the separate estate of *Elizabeth H. Bray*, mentioned in schedule A ; and, if a partition be made in kind of those slaves of which they hold an undivided half, they must take the benefit of such sole heirship accordingly. The said five minors will take, or be allowed in partition, the one-half of the *Bray* community, which shall remain after its liquidation and settlement, and five-sevenths of the remaining half ; the said two minor children of the second marriage taking the remaining two-sevenths of said remaining half. The surviving widow, *Ann B. Gillespie*, will take one-half of the *Gillespie* community, which shall remain after its liquidation and settlement. The other half of said *Gillespie* community will be divided in equal shares of one-seventh each, between the seven minor children. The separate estate of the said *L. W. Elam*, which shall remain after the settlement thereof, will be equally divided between the seven minor children.

EUSTIS, C. J. It has been contended that the *Gillespie* community is not entitled to recompense for the debts of the husband, paid by him during the community, out of revenues arising from his separate estate. If the revenues of the estate of the husband formed a part of the community, and we do not understand this to be questioned, their origin does not affect the right of the community to exact remuneration for the payment of debts to which they may have been applied.

Our views concerning the extent and intendment of art. 2373 of the Code, which constitutes the husband the head and master of the community, have been given in the case of *Guice* v. *Lawrence, syndic*, 2 Annual R. 226. Although the husband may dispose of the moveable effects of the community even by a *gratuitous title*, for the benefit of any person, yet the inference, from the unlimited control over the whole property of the community, that his separate estate is not responsible to the community on its dissolution for his debts which have been paid out of the funds of the community, and which he had an undoubted right so to pay, we consider as repelled by the formal provision of the preceding article, 2372, which says :

" In the same manner the debts contracted during the marriage enter into the partnership or community of gains, and must be acquitted out of the common funds ; whilst the debts of both husband and wife anterior to the marriage must be acquitted out of their own personal and individual effects."

The provision of article 2377, we understand to be in the same sense. It negatives the idea that the separate estate of either husband or wife can be increased or improved at the expense of community without remuneration, if the improvement or increase be the result of common labor, expenses, or industry.

In a system so purely artificial as that of the community between husband and wife, it is inadmissible to defeat these positive enactments by mere conjectural implications. See the case of *Lawson et ux.* v. *Ripley*, 17 La. 250.

It is said that the judgment for $11,807 50, rendered on the 18th of April, 1843, bears no interest, and that the court below erred in allowing interest on it.

We consider this judgment or decree, so far as the money part is concerned, as settling the account between the minors and their father which relates to the separate estate of their mother, and not a final decree on a settlement of the whole succession of their mother. The affairs of the community were not in a situation to be liquidated ; the means of liquidation were wanting ; no invento-

GLENN
*v.*
ELAM.

ry had been made on its dissolution by the survivor; and the judgment only purported to settle the amount of cash which the tutor had in his hands belonging to the separate estate of the mother. We do *not* think that this is of that class of judgments in which, by its terms, interest is held to be allowed or disallowed.

The only case which occurs to us in which a question of this kind has been presented to us, is that of the *Succession of Durnford,* 1 Annual R. 92 ; but the rule in that case is inapplicable to the facts of this.

We think that interest is due from the date on which the amount in the hands of the tutor was settled and liquidated—the 18th April, 1843.

KING, J. The appellees complain of that part of the judgment of the District Court which awards interest on the revenues of the minors of the first marriage, derived from the rent of land and hire of slaves, for which the succession of their father and natural tutor was held to account.

This question appears to us to be free from doubt or difficulty, under our legislation. Art. 341 of the Code, as amended by the act of 1825 (Acts, p. 198,) provides that, " the tutor shall be bound to invest, in the name of the minor, the revenues which exceed the expenses of his ward whenever they amount to $500, otherwise he shall be bound to pay" " legal interest" " on such excess." This article leaves no question as to the right of the minor to interest on his revenues, nor as to the liability of the tutor to pay interest, who neglects to invest those revenues, when their excess over the expenditures of the minor amounts to $500.

In adjusting the account of the tutor with his wards, the entire revenues of the latter, as well those derived from the rent of land and the hire of slaves, as the interest which the tutor may have become liable to pay under the article above referred to, are to be computed annually. The excess of those revenues over the expenses of the minor are considered as forming, from that date, a part of the minor's capital, in the hands of his tutor, and upon that excess, when it amounts to $500, the tutor owes interest, if he fail to invest it as directed by law.

The intention of the law is, that the whole estate of the minor, consisting, both of the original inheritance and of the revenues which it may have yielded, shall be productive ; and this purpose can be defeated by no failure of the tutor to perform one of the duties of his trust. See *Lowe* v. *Armant,* 9 Rob. 239.

Toullier, commenting upon the corresponding provisions of the french Code, says :

" Les intérêts des deniers pupillaires qui sont payés au tuteur sont réunis chaque année aux capitaux et à l'excédant des revenus sur dépense, pour produire de nouveaux intérêts, parce qu'ils deviennent eux-mêmes des capitaux. Il en est de même des intérêts dus par le tuteur. On distingue deux personnes dans le tuteur qui est débiteur du pupille. Tout administrateur qui est en même tems debiteur doit, chaque année, porter en compte les intérêts des sommes qu'il doit, et qui se trouvent ainsi capitalisés. Ces intérêts entrent dans l'excédant des revenus sur la dépense. Cet excédant doit être employé ; l'intérêt en est du, fante d'emploi." Vol. 2, no. 1217, p. 385.

It is, therefore, decreed, that the judgment of the court below be reversed ; and that the property described in the schedules A. B. C. D., annexed as parts of this decree, be the property of the respective parties or estates as therein set forth. It is further decreed that the rights and claims of the respective parties be concluded by the schedules E. F. G. and H., as to all the matters

GLENN<br>v.<br>ELAM.

embraced in said schedules, and as therein is set forth. It is further decreed that this cause be remanded for further proceedings according to law, and especially for a final liquidation settlement and partition according to the principles established by the opinion of this court, and in accordance with said schedules; and that the costs of this suit be borne in equal portions by the four estates mentioned in schedules A. B. C. and D. And it is further decreed that, the tacit mortgages in favor of said seven minor children, as they exist, be reversed.