287 So.2d 497 (1973)
Neva Felker CREECH
v.
CAPITOL MACK, INC., et al.
No. 53021.
Supreme Court of Louisiana.
October 29, 1973.
Rehearing Denied January 24, 1974.
*499 Herschel C. Adcock, Womack & Adcock, Baton Rouge, for plaintiff-applicant.
John F. Ward, Jr., Glusman, Ward, Moore & Lopez, Baton Rouge, for defendant-respondent.
John S. Campbell, Jr., and A. Michael Dufilho of Taylor, Porter, Brooks & Phillips, Jerry McKernan, Baton Rouge, for amicus curiae.
BARHAM, Justice.
We granted certiorari for the specific purpose of reconsidering this Court's decision in United States Fidelity and Guaranty Company v. Green, 252 La. 227, 210 So. 2d 328 (1968) where this Court held that a creditor of the husband for antenuptial *500 debts could not satisfy such debts by seizure of the effects of the community of acquets and gains. We now overrule that case and conclude that the husband's antenuptial debts may be satisfied from the assets of the community of acquets and gains.
G. L. Creech was married the first time to Neva F. Creech. On May 27, 1966 they were separated from bed and board by decree of the Family Court of East Baton Rouge Parish. Thereafter, on June 21, 1966, the parties executed a settlement of the community of acquets and gains previously existing between them.
By the terms of the community settlement Neva F. Creech received the family residence, various parcels of land, debentures, certain bank and finance company stock, and one-half of the stock of three businesses operated by G. L. Creech. In connection with this community settlement, the three corporations agreed to acquire the stock received by Neva F. Creech in the settlement. As consideration therefor a promissory note dated June 27, 1966 in the amount of $98,500 was executed by one of the corporations, Capitol Mack, Inc., and endorsed by G. L. Creech in payment of the stock Neva F. Creech transferred in that corporation.
Subsequently, in 1967, Neva F. Creech obtained a final divorce. Then on July 27, 1968 G. L. Creech married Barbara Carney Hair. The following September they acquired a house and lot which they occupied as a family residence.
Creech became delinquent in the payments due on the note held by his first wife. She therefore instituted suit for its collection on September 24, 1970 and obtained judgment on September 22, 1971 for the balance due, $90,500, plus interest and attorneys' fees. The judgment remained unpaid, and Neva F. Creech caused a writ of fieri facias to issue directing the seizure of the house and lot and the household effects contained therein, which at that time composed the family residence of G. L. Creech and his second wife.
Creech and his second wife intervened in the proceedings to enjoin the seizure and sale. They asserted that the property sought to be seized and sold in satisfaction of Creech's antenuptial debts belonged to the community of acquets and gains existing by virtue of the second marriage. They further alleged that under the authority of Article 2403 of the Civil Code the community estate was not responsible for the husband's antenuptial debts.
The trial judge found that the house and lot sought to be seized belonged to the community existing by virtue of Creech's second marriage. The various items of movable property were determined to be the separate property of the second wife. Accordingly, the trial judge sustained the position of the intervenors, holding that neither the house and lot belonging to the second community nor the wife's separate property could be seized in satisfaction of the debt incurred by the husband prior to the second marriage. The decision was based on Article 2403 of the Civil Code and the decision in United States Fidelity and Guaranty Company v. Green, supra. On appeal to the First Circuit, the judgment was affirmed. 268 So.2d 695 (1972).
The holding by our Court in the Green case was based on Civil Code Article 2403 which fixes the contractual obligations between the spouses of a marriage and which does not attempt to establish the legal relations between a creditor and the husband. The Court failed to consider Civil Code Articles 3182 and 3183 which do establish creditors' right against their debtors. Moreover, the Court there believed previously settled jurisprudence in regard to the community's liability for antenuptial debts had been overruled by cases which, in dictum or otherwise, made statements only in regard to the nature of the interest of the wife in the community.
Two early cases, Dixon v. Dixon's Executors, 4 La. 188, 23 Am.Dec. 478 (1832), *501 and Theall v. Theall, 7 La. 226, 26 Am. Dec. 501 (1834) are often cited for and discussed in view of broader holdings than actually are made in these cases. All that was said in Dixon is that the wife's right to the one-half interest in the community "* * * may be enforced not alone when the marriage is dissolved, but whenever the community ceases." Its final holding is "* * * It is, therefore, clear, she has rights in the acquests [sic, acquets] before the husband dies; and after as much reflection as we are able to bestow on the subject, we can discover no reason why these rights do not exist to the same extent, and should not be as susceptible of being enforced, when the community ceases by a repeal of the law, as they are when it terminates by a separation from bed and board." (Emphasis here and elsewhere supplied.) The case makes no statement in relation to the obligation of the community for antenuptial debts, nor does it make any statement of the exact nature of the wife's rights in the community acquets during the marriage. The case merely recognizes the wife's rights upon the termination or dissolution of the community regime. Theall v. Theall is not concerned with the community during the marriage, nor with its obligations for antenuptial debts. It merely holds that the husband's mortis causa disposition of onehalf of his estate conveys one-half of his interest in the community and that the wife takes one-half of the total community by reason of the contractual obligations flowing from the matrimonial regime creating the community of gains.[1]
In Guice v. Lawrence, Syndic., 2 La. Ann. 226 (1847), our Court specifically dealt for the first time with the obligation of the community for the debts of a husband created anterior to the marriage. The court said:
"The laws of Louisiana have never recognized a title in the wife during marriage, to one-half of the acquets and gains. The rule of the Spanish law on that subject, is laid down by Febrero with his usual precision. The ownership of the wife, says that author, is revocable and fictitious during marriage. As long as the husband lives and the marriage is not dissolved, the wife must not say that she has gananciales, nor is she to prevent the husband from using them, under the pretext that the law gives her one-half. But, soluto matrimonio, she becomes irrevocably the owner of one undivided half, in the manner provided by law for ordinary joint ownership. The husband is, during marriage, real y verdadero dueno de todos, y tiene en el efecto de su dominio irrevocable. Febrero Adic., tomo 1 y 4, part 2d, bk. 1st, chap. 4, parag. 1, nos. 29 and 30. Pothier, communaute, p. 35 and following. 12 Toullier, chap. 2, nos. 72 to 31. 14 Duranton, Droit Franc, p. 281 and foll. 10 Dalloz, Jurisp. p. 198 and fol.
"The provisions of our Code on the same subject are the embodiment of those of the spanish law, without any change. The husband is head and master of the community, and has power to alienate the immovables which compose it by an encumbered title, without the consent or permission of his wife. Civil Code, art. 2373. The voluntary surrender of his property by Smalley to his creditors, became him, after acceptance, *502 such an alienation. Under the express provisions of the act of 1826, he was absolutely divested of the title, and his creditors were vested with it. 2d Moreau's Dig. p. 437."
It is true that Guice v. Lawrence takes point with some of the dictum in Dixon v. Dixon's Executors, but the two cases are not in direct conflict in their holdings. The clear holding in Guice is reaffirmed in Glenn v. Elam, 3 La.Ann. 611 (1848). Glenn v. Elam admits that the private and separate debts of the husband, created anterior to the marriage, may be satisfied out of the community during the marriage, but holds that upon the dissolution, to the extent that the separate property of the husband has been increased, remuneration must be made to the wife of one-half of that increase. Davis v. Compton, 13 La. Ann. 396 (1858) states,
"As the husband has the right to alienate the effects of the community without the consent of his wife, creditors of the husband before marriage ought also to have the right to seize the effects of the community to satisfy their claims. 2 An. 226, Guice v. Lawrence, Syndic; 3 An. 615, Glenn v. Elam."
It further recognizes the right of reimbursement at the dissolution of the marriage for the increase in the separate and paraphernal property of either spouse during the marriage at the expense of the community.
Guice v. Lawrence, Glenn v. Elam, and Davis v. Compton differ from Dixon v. Dixon's Executors, and Theall v. Theall only in the discussion of the nature of the interest of the wife in the community during the marriage. They are not in conflict upon the point of whether the community is responsible for the antenuptial debts of the husband. Fazzio v. Krieger, 226 La. 511, at 524, 76 So.2d 713, at 717 (1954). In fact, Guice v. Lawrence, Glenn v. Elam and Davis v. Compton were followed without deviation by our courts until the Green case. Hill v. Abell, 5 La.App. 497 (2d Cir. 1927); Favrot v. Paine and Bourgeois, 9 La.App. 30, 118 So. 775 (1st Cir. 1928); First National Bank of Ville Platte v. Coreil, 145 So. 395 (La.App.1st Cir. 1933); Magnolia Petroleum Co. v. Crigler, 12 So. 2d 511 (La.App.2d Cir. 1942); Stafford v. Sumrall, 21 So.2d 83 (La.App.1st Cir. 1945); Landreneau v. Ceasar, 153 So.2d 145 (La.App.3rd Cir. 1963).[2] See also Fazzio v. Krieger, supra.[3]
The confusion in the jurisprudence came as a result of Phillips v. Phillips, 160 La. 813, 107 So. 584 (1926) which discussed not the question of the community's liability for the antenuptial debts, but rather the nature of the wife's interest in the community during the marriage. Phillips v. Phillips held that the wife had not a mere expectancy in the community during the existence of the marital regime. The opinion in Phillips states that the line of cases following Guice v. Lawrence on the nature of the wife's interest in the community was overruled and the theory of Dixon v. Dixon's Executors and Theall v. Theall was reinstated.
It may be seen then, that jurisprudentially, the rule of law in Louisiana has consistently been that the community was responsible for the antenuptial debts of the husband, subject only to an accounting to the wife upon the dissolution of the community of acquets and gains for any increase to the separate property of the husband which came out of the community property. The wife was entitled to onehalf of the increase in the husband's separate estate by virtue of the discharge of *503 antenuptial debts from the community of acquets and gains.
In United States Fidelity and Guaranty Company v. Green, supra, this Court expressed the belief that Phillips v. Phillips, and other cases which merely defined the wife's interest in the community, had overruled the long line of cases which had held the community liable for the antenuptial debts of the husband. The Green case is out of line with the jurisprudence and was severely criticized.[4]
We now examine the issue of the responsibility of the community for antenuptial debts by resorting to a complete study of our Code, its sources and the evolution of those sources, as well as our own case law.
La. Civil Code Book I, Title IV, carrying the title, "Of Husband and Wife" treats of marriage and the respective rights and obligations of married persons. Under Book III of the Civil Code, which concerns itself with the different modes of acquiring the ownership of things, Title III treats generally of obligations. Title IV treats "Of Conventional Obligations." Title V treats "Of Quasi Contracts, and of Offenses and Quasi Offenses," and Title VI treats "Of the Marriage Contract, and of the Respective Rights of the Parties in Relation to Their Property."
In our law, marriage is a civil contract. Civil Code Article 2325. Bilbe, Constitutionality of Sex Based Differentiations in the Louisiana Community Property Regime, 19 Loyola L.Rev. 373, 376. The obligations and duties of the parties to that contract in relation to their property rights are set forth under the articles of Book III, Title VI. These regulations are the law of obligations of the particular contract, i.e., marriage, as between the parties.
Article 2399 provides:
"Every marriage contracted in this State, superinduces of right partnership or community of acquets or gains, if there be no stipulation to the contrary."
Civil Code Article 2402 defines the assets of the community. Civil Code Article 2403 provides:
"In the same manner, the debts contracted during the marriage enter into the partnership or community of gains, and must be acquitted out of the common fund, whilst the debts of both husband and wife, anterior to the marriage, must be acquitted out of their own personal and individual effects."
Civil Code Article 2404 places the husband as head and master of the community, permitting him to alienate by onerous title or gratuitous title the movable effects of the community, without the consent of the wife and permitting him to alienate by onerous title, without the consent of the wife, other effects of the community. It provides that if the husband disposes of the common property by fraud to injure the wife, her remedy is against the heirs of her husband.
Civil Code Article 2408 provides that when the separate property of either the husband or the wife has been increased or improved by the result of the common labor, expenses or industry of the parties, the other spouse or his or her heirs or assigns, is entitled to one-half of the value of the increase.
Civil Code Article 2410 provides that the wife has the privilege of renouncing the community of gains in order to exonerate herself from debts, but Article 2411 provides that she retains all of her own effects, "whether dotal or extradotal."
It is thus very clear that the community regime is contractual. The law *504 above fixes the contractual status of the parties in the absence of other permitted contractual stipulations. These laws, in no respect, apply to or fix third party creditor rights. "The community of gains, being a contract between the spouses, can have direct effects only between them." Pascal, Work of the Louisiana Appellate Courts for the 1970-1971 Term: Matrimonial Regimes, 32 La.L.Rev. 219, 225.
Civil Code Article 3182 reads:
"Whoever has bound himself personally, is obliged to fulfill his engagements out of all his property, movable and immovable, present and future."

Article 3183 provides, in part:
"The property of the debtor is the common pledge of his creditors, * * *"
A most neglected part of the law jurisprudentially, and yet a most essential part of the law of Louisiana and of the civilian tradition, is that law which deals with patrimony. Patrimony is the total mass of existing or potential rights and liabilities attached to a person for the satisfaction of his economic needs. Patrimony is always attached to a natural or juridical person. Civil Code Article 493. A husband has a patrimony; the wife has a patrimony. The "community" is neither a natural nor a juridical person or entity. Therefore, the "community" has no patrimony. 2 A. Yiannopoulos, Louisiana Civil Law Treatise § 77 (1967).
In theory, the patrimony of a debtor is the totality of his assets and liabilities which are susceptible of pecuniary evaluation. As a practical matter, the debtor's patrimony consists of assets which are subject to execution for the benefit of a creditor. 2 A. Yiannopoulos, Louisiana Civil Law Treatise § 78 (1967).
Since all the property of a debtor is subject to the rights of his creditor, we must here determine what the patrimony of the husband is, which necessarily requires us to determine what the patrimony of the wife is during the contract of marriage which established a community of acquets and gains between the spouses. In order to determine the respective patrimony of the spouses, we must, as a prerequisite, determine the interest of each spouse in the "common property" or the property which makes up the community of acquets and gains existing between the spouses.
Almost all of the cases which deal with the spousal interest in the community of gains consider that an examination of the Spanish law must be made, since it is believed to be a principal source for our concept of the community of acquets and gains.[5] Our Court has previously held that Spanish law is the source for Civil Code Article 2403, which is of primary concern to us here. Fazzio v. Krieger, supra. We reaffirm that particular holding. The Digest of 1808 Book 3, Title 5, Law 65, according to Moreau Lislet's notes,[6] lists the following as sources of law which were examined in the drafting of the predecessor of our Article 2403: Fuero real Liv. 3. Tit. 20. Loi 14 Feb. Cont. [Febrero, Libreria de Escribanos, Part 1, 1789] v. 1. ch. 1. § 22. N:23b . . . Feb. Jui. [Febrero, Liberia de Escribanos, Part 2, 1790] vol. 1. liv. 1. c. 6. § 1. N: 1 & 2. Febrero, Libreria de Escribanos, Part 1, Book 1 (1789), Chap. 1, § 22:
"Los bienes que marido, y muger adquieren, y multiplican constante matrimonio mientras viven juntos, se les comunican por mitad * * * Del mismo modo son comunes las deudas que contraen, *505 y de ellos deben pagarse;3 pero cada conyuge tiene obligacion de satisfacer de los suyos propios ya sean, o no gananciales, las que contraxo, y tenia antes de casarse.4 * * *"
Footnotes:3. Ley 14, tit. 20. lib. 3. del Fuero Real.
4. Leyes I. tit. 3. lib. 3. del Fuero Real, y 207. y 223. del Estilo.
English translation:
"The things which the husband and wife acquire and increase during marriage while living together are shared by halves . . . . In the same manner are common the debts which they contract, and from them [the common assets] they ought to be paid; but each spouse has the obligation to satisfy from his separate assets his own [or non-community] debts which he contracted and had before marriage . . ."
Febrero, Libreria de Escribanos, Part Two, Book I (1790) Chap. 6, § 1:
"Separado del acerbo del caudal inventariado el importe de los respectivos fondos, o capitales que los conyuges pusieron, y entraron en su conyugal sociedad: baxadas las duedas que mientras duro, contraxeron: y liquidadas, y partidas con iqualdad las utilidades, o ganancias que resulten: lo que debe practicar el contador partidor, es unir la mitad de estas a todo lo que por sus derechos toca a la muger, y la otra mirad a lo que por el suyo corresponde a su marido: y del total privativo haber de este, y no del caudal comun deducir las duedas que antes de casarse contraxo, por incumbirle peculiarmente, y no a la sociedad su satisfaction * * *"
English translation:
"Having separated from the whole inventory the respective funds or capital of the spuses which entered the community of gains, and having deducted the debts contracted by them during its existence, and having partitioned the surplus in equal portions, what the partitioning accountant ought to do is to unite half of these to the separate things of the wife, and the other half to the husband's [separate things]: and from [each] separate patrimony [privativo] so made up, and not from the common fund [as such], deduct the debts which [the particular spouse] had contracted before marriage, so as to charge him particularly, and not the conjugal association [sociedad], for its satisfaction * * *"
Febrero, in his commentary on this subject, cites Leyes del Estilo (1310) Law 207, which was derived in part from Fuero Real (1255), Book 3, Title 20, Law 14:
"Quando la muger es obligada a las debdas que faze el marido durante el matrimonio.
"Todo el debdo el marido, et la muger fizieren en uno, paguenlo otrosi en uno. Et es a saber, que el debdo que faze el marido, maguer la muger non lo otorque, nin sea en la carta del debdo, tenuda es a la meytad del debdo."
English translation:
"When the wife is liable for the debts contracted by the husband during the marriage.
"Every debt that husband and wife have contracted in common, let them likewise pay it in common. And that is to say, that the debt that the husband contracts, although the wife does not authorize it and is not a party to the evidence of debt, she is obligated for half of the debt."
Moreau Lislet cites Fuero Real (1255), Book 3, Title 20, Law 14, which is also commented upon and cited by Febrero:
"Como el duedo fecho durante el matrimonio, lo deben pagar marido, e muger justamente.
"Todo duedo que marido, e la muger ficieren en uno, paguenlo, otrosi, en uno; e si antes que fuesen ayuntados por casamiento algunos dellos ficiere duedo, paguelo *506 aquel que lo fizo, y el otro no sea tenudo de pagarlo de sus bienes."
English translation:
"How a debt contracted during marriage should rightly be paid by husband and wife.
"Every debt that husband and wife have contracted in common, let them likewise discharge it in common; and if before they were joined in marriage either of them contracted a debt, let that one pay it who contracted it, and the other shall not be liable to pay it from his or her properties."
These, then, are the sources of our Civil Code Article 2403. It is apparent that our Article 2403 is an almost verbatim translation of Fuero Real (1255), Book 3, Title 20, La. 14. Moreau Lislet depended almost entirely upon the commentaries of Febrero when he sought to examine Spanish law. This is probably accounted for by the fact that Febrero's commentaries were the most recent and complete, having been published in 1789 and 1790, just before Lislet's consideration of the project for our Code.
It is important to note that Febrero, in both volumes of his works, was writing for notaries. In connection with the marital regime he was concerned with the notary's need for knowledge in the field of law for the drafting of marital contracts and for knowledge of the notarial work attached to the succession proceedings upon the dissolution of marriage by death. Therefore, it is obvious that Febrero contemplated the rights and relations of the parties to the contract of marriage and also the rights and obligations of the parties upon the dissolution of the contract of marriage.
Even before Febrero's commentaries, other earlier commentators clearly distinguished between the rights of the parties during the marital regime and the rights of the parties upon dissolution of the marital regime. Alfonso de Azevedo stated: "In respect of debts contracted before marriage the wife will not be liable to pay anything out of her share of the profits acquired during the marriage. * * * From this it may be inferred that, if a husband during marriage discharges debts contracted by him before marriage, he must on dissolution of marriage make good and pay to the wife out of his private property a moiety of the debts so discharged during marriage."[7]
Juan Gutierrez, after first recognizing that antenuptial debts are to be discharged out of separate property, states:
"And I think this view the truest and the one to be taken. And I think the same holds good if the husband spends anything else, or the wife, to recover the goods of a child of a former marriage, or for another personal reason, for the same reasons as those on which it is held that on the dissolution of marriage the debts of one of the spouses contracted before marriage should not be subtracted from the common heap of goods, but from the share of the spouse who contracted them, vide. Dig. 17.2.27 and L. 14 tit. 20 lib. 3 Fori, as Ayora maintains in terms, `de partit.' 1 part. cap. 7. no. 1."[8]
It then becomes apparent that the Spanish law, as it was practiced in the State of Louisiana prior to the adoption of our Civil Code, treated the marriage as a contract between the parties. Third party *507 relations to those who were parties to the marriage were not fixed in these laws dealing with the marital contract. While antenuptial debts of the husband had to be finally discharged out of his separate property, no law provided immunity from his antenuptial debtors for the husband or for the community property which he controlled and administered. We thus conclude that Civil Code Article 2403 was drafted for the specific purpose of regulating the rights and responsibilities between the parties to the contract of marriage.
The entire title of that part of our Code containing Articles 2403 and 2404 concerns itself only with the rights and obligations of the spouses and that of their heirs and assigns. Those not in privity to the marital contract are not the concern of Title VI, except in two instances discussed hereinafter.
Pertinent to a consideration of the issue before us is the examination of the action for separation of property sourced in French law, which may be prayed for by the wife during the marriage.[9] Article 2433 provides particularly that the personal creditors of the wife cannot, without her consent, petition for separation of the community property. On the other hand, Civil Code Article 2434 permits the creditors of the husband not only to object to the wife's suit for separation of property, but permits them to become parties to the suit and to be heard against it. These are the only two Articles in Title VI which concern third party rights. These articles demonstrate a vast difference in the rights of the creditors of the husband and the rights of the creditors of the wife. The pertinent question becomeswhy is there this great difference between these two sets of creditors, unless the rights of the parties in regard to the ownership of the property of the community are distinct and different?
We have previously said that the husband has only one patrimony and the wife only one patrimony, and that the community of acquets and gains is not a natural or juridical person or entity, capable of possessing a patrimony. What was the patrimony envisioned by Febrero for the husband and the wife, since Febrero obviously embellishes upon Fuero Real (1255), Book 3, Title 20, Law 14 and our Article 2403 is obviously drawn from these sources. Fuero Real said, "Let the owner who contracted the antenuptial debt pay it and the other shall not be liable to pay it from his or her properties." Febrero says, "* * * each spouse has the obligation to satisfy from his separate assets * * *" premarital debts. Obviously, the Fuero Real of which Febrero made comment, as well as Febrero's comment, anticipated the personal obligations of the spouses to each other and did not attempt to fix the responsibilities of the community in relation to third parties. A cardinal principle of law is that no one can absolve himself of obligations incurred toward another except through some discharge acceptable to that third party. La.Civ.C. Art. 3182. Unless one is authorized by law or contract to represent another, his own contract obligates only himself. If the husband or the wife has incurred an obligation toward a third person before marriage, that person then may enforce his right against all of the assets considered to be a part of the patrimony of the husband or of the wife, as the case may be.
The words "community" and "common" give notice that both spouses have some kind of interest in the assets and liabilities which comprise the community of gains. We are not as concerned with placing a descriptive name on this interest as much as we are with determining what obligations and rights flow from that interest. Civil Code Article 2404 establishes that, other than for the exceptional case, *508 the husband administers all the things in the community as head and master of the community as if they were his own separate property. If he can alienate this property in the manner previously described, then as far as third persons are concerned, these properties are as if they were his own, whether in fact they are or not. He may with immunity discharge an antenuptial debt by voluntary payment out of community funds. Thus, third parties necessarily view the husband's patrimony as including the liabilities and assets of the community. Since the wife is given options at the dissolution of the marriage in regard to claiming or renouncing her onehalf interest in the community of acquets and gains, it cannot be said that she has an interest in the community which is equivalent to perfect ownership.
We turn now to a discussion of Phillips v. Phillips, supra, wherein it was said, "* * * that the wife had not a mere expectancy but the absolute ownership of half of the community property during the existence of the community, subject, of course, to the husband's power of administration." Phillips relies upon Arnett v. Reade, 220 U.S. 311, 31 S.Ct. 425, 55 L.Ed. 477 (1910).,[10] Arnett v. Reade, after a discussion of the "confusion between the practical effect of the husband's power [over the community] and its legal ground," and after intimating that the confusion there had arisen through mistranslation of the Spanish word "dominio", simply held "* * * However this may be, it is very plain that the wife has a greater interest than the mere possibility of an expectant heir." No civilian would disagree with the above statement and the full holding of Arnett v. Reade.
The Phillips case painted with a brush far broader than the subject needed and contains much dictum. We feel it necessary to be more precise in expressing the interest of the wife in the community of acquets and gains during the existence of the marital regime. That interest is more than a mere expectancy or a mere right to inherit. Febrero says the wife has dominion, but Febrero also says the wife does not have the use of the community or even of her one-half interest. The wife does have dominion, but since use and control are necessary ingredients of perfect ownership, that dominion or ownership which the wife has falls short of perfect ownership. Civil Code Articles 490, 491 and 492. The wife has an acquired right to sue for a separation of property during the marriage in case of mismanagement, an acquired right to accept or renounce the community upon its dissolution, an acquired right to accept the community with benefit of inventory upon dissolution, an acquired right to sue the husband or his heirs for an alienation made in fraud, and an acquired right to demand an accounting for enrichment of the husband's separate and paraphernal estate from the community of gains.
The wife then owns an interest in the community, but the ownership of that interest does not consist of ownership of particular assets, or of a particular one-half of the community. In the relationships between husband and wife the husband owns one-half of the individual assets of the community in perfect ownership. Civil Code Article 491. He also has the administration (use and enjoyment) of the other one-half with power of alienation. The wife owns one-half of the individual assets of the community in imperfect ownership. Civil Code Article 492. Her ownership becomes perfect on dissolution of the community. Insofar as third persons are concerned (e.g., creditors) during the existence of the community property regime the husband owns the individual assets of the community. The assets and liabilities of the whole community are considered the patrimony of the husband during the marriage. The wife's patrimonial interest in the community is the *509 imperfect ownership with the above enumerated acquired rights and other rights which flow from the marital contract or by effect of laws treating of the rights and obligations of the spouses during marriage.
American commentators, who write about the matrimonial regime, are often cited by our courts as being authoritative on the Louisiana community property law. One must be mindful in reading such authors as deFuniak and McKay [11] that of all the American states which incorporate some form of community property into their matrimonial regime law, only Louisiana is a civilian system following entirely the civilian tradition. All the other states have to interpret their community property law, which admittedly came from Spanish sources, in light of the common law origin of most of their other laws. Necessarily, when common law property is intertwined with the civilian concept of community property, the result is a hybrid. McKay, supra, distinguishes between the civil law rule and the common law rule of ownership of community property during the marriage. McKay points out that the leading element in ownership in the civil law sense is the idea of power over things, "dominio". Since power over the thing is the essential of perfect ownership in the civilian tradition, it is easy to recognize the distinction of the growth of our community property law from the other states in the United States. The Spanish civilians sometimes define the rights of the wife in the community as "feigned and revocable dominion". McKay in § 1103 says:
"The word dominion implies ownership the highest form of right known to the law. Why call her right a form of dominion if she has no present form of right whatever? The adjective `feigned' seemed designed to contrast the wife's right with the husband's; he has the `real' dominion; she has only the `feigned' dominion. But fairly understood this word does not imply that the wife has no form of right during marriage. The word `revocable' is used to explain that even her feigned dominion may be revoked by the husband's conveyance."
We, in Louisiana, have somewhat strengthened the wife's dominion over that expressed in our Spanish sources as they existed when our Code was adopted. The Spanish provided no right for separation of property, and they provided for forfeiture of the wife's interest in the community if she were guilty of the act of adultery. We have provided that even during the marital regime the wife may, under certain circumstances, force a partition of the community so that she might have complete dominionuse and ownershipof her one-half interest in the community. In both France and Spain the law has evolved to expressly provide for the satisfaction of antenuptial debts out of the community's property.[12]
*510 We conclude that the wife's interest in the community is imperfect ownership without use, and consists of certain acquired rights including suit for separation of the community, acceptance or renouncing of the community, and a full accounting upon dissolution of the community. As to third persons, her patrimony then consists of her separate property in perfect ownership and the imperfect ownership without use of one-half of the community with certain acquired rights. We further hold that the husband's patrimony consists of his separate property and the community of acquets and gains. His use of the community property is restricted only by the express and specific legal requirements attaching to the contract of marriage. We thus finally conclude that since the community of gains is a part of the husband's patrimony, it is subject to creditor's rights, Civil Code Articles 3182 and 3183, however, the husband must account for the enrichment of his separate estate by the discharge of antenuptial debts upon dissolution of the community.
We overrule United States Fidelity and Guaranty Company v. Green, supra. Phillips v. Phillips, supra, is overruled or modified to the extent it conflicts with this opinion. We specifically overrule the statement in Phillips v. Phillips, that Guice v. Lawrence and its progeny are not the law for holding the community subject to the antenuptial creditors' rights. To the extent that Fazzio v. Krieger limits the husband's antenuptial creditor's claim `to the husband's one-half interest in the community, it is overruled.
The judgments of the appellate and trial courts are reversed and the case is remanded to the trial court for further proceedings in conformity with this opinion.
SUMMERS, J., dissents for reasons assigned.
SUMMERS, Justice (dissenting).
After the recitations in Article 2402 of the Civil Code that the partnership or community consists of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during marriage, Article 2403 provides:
In the same manner, the debts contracted during the marriage enter into the partnership or community of gains, and must be acquitted out of the common fund, whilst the debts of both husband *511 and wife, anterior to the marriage, must be acquitted out of their own personal and individual effects.
Our interpretation of this Article in the unanimous decision handed down in the Green Case was based on the "positive pronouncements" of the Code that "the debts of both husband and wife, anterior to the marriage, must be acquitted out of their own personal and individual effects." In that decision we held that the antenuptial debts of the husband could not be satisfied by a garnishment of the wages of the wife and the seizure of a bank account in her name, both of which were conceded to be community assets.
In doing so we recognized the early decisions holding to the contrary commencing with Guice v. Lawrence, 2 La.Ann. 226 (1847), followed in Glenn v. Elam, 3 La. Ann. 611 (1848), and Davis v. Compton, 13 La.Ann. 396 (1858). However, the Green Court pointed out that the decisions in those early cases were based upon the erroneous assumption that the wife's ownership of the community was a mere expectancy of residuary interest until the community was dissolved. In effect we held that these early cases had been overruled by the decision in Phillips v. Phillips, 160 La. 813, 107 So. 584 (1926), affirming the principle that the wife's right in the property acquired during the existence of the community is not a mere expectancy which comes into being upon dissolution of the marriage, but her interest in community property exists as a matter of fact and in legal contemplation at the inception of the marital relation, her interest being as great as the husband's and entitled to equal dignity.
I note moreover that the redactors of the Civil Code of 1825 and 1870 failed to specifically provide that the wife had only a future interest in the community although the Civil Code of 1808 so provided. See Art. 2373, La.Civil Code of 1825; Art. 2404, La.Civil Code of 1870; cf. La.Civil Code of 1808, Bk, III, Tit. 5, Art. 66. Apparently this change in the codal provision serves to confirm the view that the wife owns one-half of the community property. For when there are two statutes on the same subject, one being later, and amending and re-enacting the other, any part of the earlier statute omitted from the later one is repealed. Fischer v. Dubroca, 163 La. 292, 111 So. 710 (1927). See also Succession of Wiener, 203 La. 649, 14 So.2d 475 (1943).
In Green we also questioned the logic of the court's reasoning in Guice v. Lawrence, supra, that since the husband has the right to alienate the effects of the community without the consent of his wife, creditors of the husband before the marriage ought also to have the right to seize the effects of the community to satisfy their claims.
It does not follow that because the husband is head and master of the community vested with authority to voluntarily alienate the effects of the community (La.Civil Code Art. 2404) that his creditors may hold the community estate involuntarily responsible for obligations he incurred prior to marriage. In the first instance, the law specifically authorizes the husband to voluntarily alienate the effects of the community as head and master. It is an authority supported by the practical needs of efficient administration. Any good partnership must have someone at the head of its affairs. Alienations which the husband is authorized to make are voluntary ones. On the other hand, nothing in the authority of the husband as head and master implies that the protection afforded to the community by Article 2403 is meaningless, or that the effects of the community may be reached by antenuptial creditors against the will of the spouses. That is the effect of the reasoning in Guice v. Lawrence, which we rejected.
By the decision in Green we sought to abolish the erroneous concept that the community property is liable to seizure for payment of the debts of the husband contracted before marriage, a concept fostered by the decisions in Hawley v. Crescent *512 City Bank, 26 La.Ann. 230 (1874); Davis v. Compton, 13 La.Ann. 396 (1858); Glenn v. Elan, 3 La.Ann. 611 (1848); and Guice v. Lawrence, 2 La.Ann. 226 (1847). This was accomplished by demonstrating the faulty rationale of these cases and by overruling them.
A reconsideration of the matter leaves me convinced that the interpretation placed upon Article 2403 in the Green Case was correct. There is a need, perhaps, to make further inquiry into the intention of the legislature in enacting the statute, to more effectually ascertain the spirit of the law. La.Civil Code art. 18.
Article 2403 is a very plain and positive provision limiting the payment of debts contracted anterior to the marriage to the separate property of each spouse. La.Civil Code art. 14; McKay, Community Property § 794 (2d ed. 1925); Note, 20 Tul.L. Rev. 136, 137 (1945). A paramount rule of statutory construction in our law declares that no judicial interpretation is warranted when the language of a statute is plain and unequivocal. La. Civil Code arts. 13, 14. It would follow from the fact that Article 2403 is clear and free from all ambiguity that the court need not resort to other articles of the Code to give it meaning.
But if it could be said that the language of the article had a doubtful meaning, the intent of the redactors can be ascertained by still another principle of statutory construction universally recognized and accepted. The principle is expressio unius et exclusio alterius, which means the mention of one thing implies the exclusion of any other. Garrison v. City of Shreveport, 179 La. 605, 154 So. 622 (1934). Article 2403 refers to payment of anetnuptial debts by the spouses only out of "their own personal and individual effects." The lawmakers must therefore be understood to have intended no payment out of community property.
The history of this article supports the interpretation adopted in the Green Case. Substantively Article 2403 has remained unchanged since the Code of 1808. The origin of the article is no longer in doubt. The matrimonial regimes existing in Louisiana at the time of its purchase by the United States were Spanish in origin and nature. In Fazzio v. Krieger, 226 La. 511, 76 So.2d 713 (1954), the question was researched in depth and the materials authoritatively analyzed. See also A Digest of the Civil Laws Now in force in the Territory of Orleans (1808), the de la Vergne Volume, containing on interleaves the manuscript source notes of L. Moreau Lislet.
The notion that the Code Napoleon was a source of this article is dispelled by the obvious inconsistency and dissimilarity between its provisions and the corresponding article of the Code Napoleon, Article 1409. The latter article makes all movable debts which husband and wife owed at the time of the celebration of the marriage liabilities of the community. Litvinoff, Obligations, Book I, Sec. 13, note 38. By contrast, since 1255 A.D., the Spanish law has provided that an antenuptial debt of one spouse is the liability of his separate property alone. 1 de Funiak, Principles of Community Property, Sec. 156 (1943).
In her study of the Spanish community of gains in 1803, Nina N. Pugh concluded:
Even though the husband and the community were identical in the eyes of third persons, nothing has been found either in ancient Spanish authorities or in the early Louisiana decisions to indicate whether antenuptial creditors could have proceeded against the common assets during marriage for satisfaction of their credits, except in the case of legal charges. . . . (The Spanish Community of Gains in 1803; Sociedad de Gananciales, 30 La.L.Rev. 1 [1969]).
Adherence to the plain meaning of Article 2403 is therefore mandated. The source of this article most persuasively *513 manifests the intention of the redactors to accept the Spanish concept that the community estate is free from antenuptial debts of both spouses. It is the function of courts to interpret statutes so as to give them the meaning which the lawmaker obviously intended them to have, and not to construe them in such a fashion as to distort their meaning and destroy their spirit. State v. Jones, 201 La. 637, 10 So.2d 213 (1942). It is inadmissible to defeat this positive enactment by mere conjectural implications. Lawson v. Ripley, 17 La. 238 (1841).
To permit the husband's creditors before marriage to hold the community liable is inconsistent with the decisions which hold the wife's interest to be not a mere expectancy, but a vested, present ownership of a one-half interest in the community property. Phillips v. Phillips, 160 La. 813, 107 So. 584 (1926). The inconsistency would arise by permitting the husband's personal prenuptial creditors to satisfy their claims out of the wife's half of the community, ignoring the equal ownership of the spouses implicit in the community property system.
The construction adopted by the majority, to make the community property responsible for the antenuptial debts of the husband, is principally founded upon the premise that the right of the prenuptial creditors should be protected, otherwise they may never receive satisfaction of the debt owed to them. But, with Article 2403 before me, I cannot accept the reasoning which would protect the antenuptial creditor of the husband in preference to the wife of the second marriage, or prefer the antenuptial creditor over the family which the community sustains, or, further, permit the claim of the antenuptial creditor to conflict with the claims of community creditors whose advances have enhanced the community. Antenuptial creditors extend credit to the husband while he has only a separate estate; they do not bargain for, and should not, after the marriage, be entitled to, the benefit of the community estate later acquired by the joint effort of husband and wife Note, 20 Tul.L.Rev. 136 (1945).
Of the many and varied arguments which have been made on this subject, by far the most persuasive reasons advanced to deny the antenuptial creditor the right to reach the community estate in satisfaction of his debt has resulted from the study and research of de Funiak. He wrote:
It will be seen, then, that when the law itself imposes an obligation on a spouse, as for support of a parent, or for taxes, or for a penal sum upon sentence for a criminal delict, or the like, the spouse's half share of the community property might be reached, unlike the case of the ordinary separate creditor of the spouse. In the case of the ordinary separate creditor, his rights to reach his debtor's properties were subordinated to the well-being and interests of the family which required that the community property be kept intact for its benefit during the marriage. (1 de Funiak, Principles of Community Property, Sec. 165 [1943], See also Forsythe v. Paschal, 34 Ariz. 380, 271 Pac. 865 [1928]).
If courts would maintain the integrity of the community regime and abide by the obvious intent of the redactors of the Code as ascertained from the historical background of Article 2403, in a conflict between the rights of the creditor and the security and well-being of the wife and family, the choice must lie with the interpretation favoring the wife and family. It cannot be denied that in the delicately poised balance of the relationship between spouses, property laws play no small part. To permit an invasion of the community estate by an antenuptial creditor would disrupt and often destroy the harmony the marital relation demands. The life, happiness, prosperity and stability of the family are a matter of constant concern throughout our Code. They are concerns which are the outgrowth of natural law, equity and folksy common sense.
*514 No system is fundamentally sound or likely to survive which tends to dissolve the family as a unit. History reveals that no society has attained and maintained a high state of civilization unless the family unit was the basis of its structure. Daggett, The Community Property System of Louisiana (2d ed. 1945) passim.
I respectfully dissent.
NOTES
[1] The answer to this problem is precisely stated in Novisima Recopilacion, (1805) Book 10, Title 3, Law 8.

"The property bequeathed by the husband to the wife is not comprised in the half she has by ownership in the ganancial property.
"If the husband bequeathes anything to his wife at the time of his death or in his will, let it not be counted in the part which the wife has by ownership of the property multiplied during the marriage; but let her have such half of the property and the bequest at its lawful value. (Originally the 16th Law of Toro, promulgated by the Cortes at Toro in 1505, and continued as Law 7, Title 9, Book 5 of the Nueva Recopilacion of 1567.)
In 2 DeFuniak, Principles of Community Property 19 (1st ed. 1943).
[2] Daggett, A Comparison of the German Community Property System with That of Louisiana, 4 Tul.L.Rev. 27, 49. See footnote 157, but note citation should be to Davis v. Compton, not Meadows v. Dick, 13 La.Ann. 377.

Morrow, Matrimonial Property Law in Louisiana, 34 Tul.L.Rev. 3, 35.
[3] Fazzio held the community liable for the husband's antenuptial debts, but only to the extent of the husband's one-half interest.
[4] Pascal, Work of the Louisiana Appellate Courts for the 1968-69 Term: Matrimonial Regimes, 30 La.L.Rev. 219.

29 La.L.Rev. 409. 43 Tul.L.Rev. 376. 15 Loyola L.Rev. 166.
[5] Pugh, The Spanish Community of Gains in 1803: Sociedad de Gananciales, 30 La.L.Rev. 1.

Daggett, supra, Note 2. Morrow, supra, Note 2.
[6] Moreau Lislet, A Digest of the Civil Laws Now in Force in The Territory of Orleans' (1808) (de la Vergne vol. 1968).
[7] Alfonso de Azevedo, Commentariorvm Iuris Civilis in Hispaniae Regias Constitutiones, Tomus Tertius. Salamanticae, P. Lassus, 1597. No. 20, to Nov. Rec. Book 10, Title 4, Law 9. See 2 deFuniak (1st Ed. 1943), supra, at 442.

Cf. deFuniak, Principles of Community Property § 156 (2d Ed., 1971) where Azevedo is quoted only in part and out of context.
[8] Juan Gutierrez, Practicarvm Quaestionvm Circa Leges Regias Hispaniae. Madrid, I. de la Cuesta, 1606-1612. 5 Vol. in 4 Quaestio CXXIX(2).

2 deFuniak (1st Ed. 1943), supra, at 459.
[9] Code Civil Art. 1443. See also Daggett, The Wife's Action for a Separation of Property, 5 Tul.L.Rev. 55.
[10] Of. Garrozi v. Dastas, 204 U.S. 64, 27 S.Ct. 224, 51 L.Ed. 369 (1907).
[11] deFuniak, supra. Note 7.

McKay, A Treatise on the Law of Community Property (2d Ed. 1925).
[12] The present Spanish law relating to antenuptial debts is set forth in Codigo Civil de Espana, Article 1410:

"El pago de las deudas contraidas por el marido o la mujer antes del matrimonio no estara a cargo de la sociedad de gananciales.
"Tampoco lo estara el de las multas y condenas pecuniarias que se les impusieren.
"Sin embargo, el pago de las deudas contraidas por el marido o la mujer con anterioridad al matrimonio, y el de las multas y condenas que se le impongan, podra repetirse contra los gananciales despues de cubiertas las atenciones que enumera el art. 1408, si el conyuge deudor no tuviese capital propio o fuera insuficiente; pero al tiempo de liquidarse la sociedad se le cargara lo satisfecho por los conceptos expresados."
Translation:
"The community of acquets and gains is not liable for debts incurred by the husband or wife prior to the marriage.
"Nor is such community liable for fines or money judgments imposed upon husband or wife.
"However, payment of debts incurred by the husband or wife prior to the marriage, or of fines or judgments against them, may be recovered from the community after the liabilities listed in article 1408 have been met, when the husband or wife involved does not own personal property or such personal property is not sufficient; at the time of liquidation of the community, however, the sums defrayed for such purpose shall be charged to the share of the spouse whose debt has been thus paid."
Codigo Civil de Espana, Article 1408:
The reference in 1410 to 1408 is to provide for the discharge of certain community debts. The liabilities which must be met before antenuptial debts can be satisfied from the community are listed in 1408 as follows:
1. Debts and obligations incurred during the marriage;
2. Arrearages or interest for obligations encumbering the spouses personal property or the community's;
3. Minor repairs of personal property of the husband or wife. Major repairs must not be charged against the community;
4. Major or minor repairs of community property;
5. Support of the family and education of the children.
Manresa, Comentarios al Codigo Civil Espanol 562-563 (4th Ed. 1930), perhaps the most authoritative of the commentaries, asserts that article 1410 expressly contemplates the protection of the creditors of the husband or wife. The eminent writer is of the mind that the rule must be enforced even to the detriment of the other spouse who faces the risk that, upon liquidation of the community, the other spouse's share might not be large enough to cover the amounts defrayed for prior debts.
Always according to Manresa, a creditor bringing action against the community for an obligation prior to the marriage bears the following burden of proof to make his action expedite:
(1) That the husband or wife does not have property of his or her own;
(2) That, after meeting the obligations listed in 1408, the community has sufficient means to pay the prior debts.
Cf. Code Civil, Arts. 1409 and 1410 for the French law which permits antenuptial debts to be satisfied out of community property.